Minshall, J.
(dissenting.)
I regret that I am unable to agree with my bretheren in the decision of this case. The finding of facts shows that the checks in question had their origin in a gaming transaction ; and the only question on which we differ is, whether the plaintiff being as is said in pari delicto, can in equity ask to have them delivered up and cancelled. The transaction between the parties was in substance a bet, or series of bets, on the price of wheat, pork and lard at a future time, but, taking the form of fictitious sales for future delivery, was not only reprehensible as a gambling transaction, but was also detrimental to the public by creating a fictitious demand for these' products, and thus disturbing the normal condition of the markets. It is not necessary that we should to any extent point out the evils connected with what is called dealing in “ margins,” the twin evil of “ stock-jobbing,” characterized by Sir John Barnard’s Act, as “ infamous.” (7 Geo. 2, s. 8.) They are illustrated in the history of our markets by numerous instances, entailing not only bankruptcy and ruin upon many of the parties directly concerned, *216 but also, wide-spread distress among all classes of community,, whether producers or consumers. There is no effort of the mind by which such a transaction can be made to appear any thing else than a wager, when reduced to the plain understanding of the parties, as adopted and acted on by themselves. The seller does not intend to deliver the thing sold, nor the-buyer to receive it; the agreement is that the purchaser shall payor receive the "difference according as the price of the thing, ostensibly dealt in, goes up or down by the day. As said by Judge Barr, in Bryant v. W. U. T. Co., 22 Am. L. Reg. 613 : “This business is simply gambling — gambling of the same sort as ‘ three card monte * or ‘ faro.* It is more pernicious and demoralizing than either, for men and women will go upon a ‘stock-exchange,* a ‘ board of trade* or into a ‘bucket-shop* and put up their ‘margins* or bets upon the rise or fall of stocks or grain that would never enter a ‘ gambling hell * to bet upon the turn of a card.’* The so-called settlement takes place upon the determination of the event; one-pays what the other receives, and this is so in every wager, with this difference in language only, that the one loses what the other wins. But courts do not, in a matter of this kind, deal in mere differences of language ; the consequences to the public will be the same whether the act of parting with the money is termed the payment of a debt or the losing of a wager. See the opinion of Justice Matthews in Irwin v. Williar, 110 U. S. 499. It has been well observed that, “ If a contract be a wager in substance, no matter how the end is brought about, it would bfe void, though the object were ever so cunningly concealed in the form given to the transaction.”' Max. Int. Stat. (2nd ed.) 135.
But there is no material difference in the court as to this. The majority hold that the general doctrine, that where parties are equally guilty, a court of equity will not lend its aid to either, but leave them where it finds them, applies. This as a general rule is true, and is both wise and expedient. But it is not universal. It has many exceptions, of which gaming transactions is one. Courts do not ordinarily, independent of statute, aid a party in recovering what he has lost at gaming ; *217 but, so long as the matter remains executory, courts of law and equity will lend their assistance to the defeated party, not by reason of any merit in him, but to promote the public interests by enforcing a sound rule of public policy. Thus in a court of law the loser is permitted to defend in a suit upon a security given by him, on the ground that it was given for a gaming consideration; and, in analogy to this, courts of equity have uniformly entertained suits to require such securities tO' be given up and cancelled, where the party may be deprived of his defense in a court of law by,the negotiation of the security. This seems to be the unquestioned doctrine in a court of equity, and has been applied from an early time. Thus it is said by Mr. Ballow, the supposed author of the text of Fonblanque’s Equity, “ although equity will not usually interfere in cases relating to the gaming ácts, because it considers both winner and loser equally guilty, and, in taking upon them to game they seem to renounce the benefit of the law; yet, even at law, in an action upon a wager, they have given the defendant leave to imparl from time to time; though in strictness, it is not prohibited by the common law. Much more ought equity to discourage it, because the public is concerned that men should not mis-spend their estates and time. And in the civil law, they allow the loser to recover his money, even beyond the ordinary time of prescription.” And, in a note, Fonblanque observes that, “prior to the time of 16 Car. II, equity often interfered for the purpose of restraining the winner from proceeding at law against the loser, upon the security he had obtained for the money won,” — citing a number of cases. Fonbl. Eq. B. 1, ch. 4, § 6, and n. c. The cases cited fully sustain what is said. The same doctrine is stated by Mr. Adams. “ So long,” he says, “ as the contract continues executory, the maxim of in pari delicto does not apply ; for the nature of the contract would be a defense at law, and the decree of cancellation is only an equitable mode of rendering the defense effectual.” Adams’ Eq. m. p. 175. This doctrine is also supported by the authority of Judge Story and the cases which he cites. He says, “ In regard to gaming contracts it would follow, a fortiori, that courts of *218 equity ought not to interfere in their favor, but ought to afford aid to suppress them, since they are not only prohibited by statute, but may justly be pronounced to be immoral, as the practice tends to idleness, dissipation, and the ruin of families. No one has doubted that under such circumstances a bill in equity might bo maintained to have any gaming security- delivered up and cancelled.” Story’s Eq. Juris. § 303. He cites the following eases: Rawden v. Shadwell, 5 Ambler R. 269 and Mr. Blunt’s notes ; Woodroffe v. Farnham, 2 Vern. 291; Wynne v. Callender, 1 Russ. R. 23; Baker v. Williams, cited in Blunt’s notes to Ambler R. 269; Portarlington v. Soulby, 3 Mylne and Keen, 104. I have taken the pains to examine each of these cases, and find that, in each, relief was given a loser by the cancellation of the security he had given for the money lost. Also, Prof. Pomeroy maintains the existence of the jurisdiction in equity to grant-such relief, with no little earnestness and zeal. After stating the rule as to executed transactions of the kind, he says, “finally, as long as the contract is still executory, equity has jurisdim tion to aid the losing party by ordering the written agreement and other securities to be surrendered Up and cancelled, and by granting the ancillary remedy of injunction to restrain their negotiation, transfer or enforcement; and when the circumstances are such that the defensive remedy at law would not be equally certain, complete and adequate, this jurisdiction ought to be and will be exercised.” He then adds, “ this conclusion is sustained by the highest authority, and is in perfect accord with principle.” Pom. Eq. Juris. § 938 and n 1. It is difficult for the mind to make a distinction in principle between a court entertaining the defense that the consideration of a security, in an action upon it by the holder, is immoral, and, for a like reason, entertaining a suit to have it delivered up and cancelled; or to give a reason why if it may entertain the plea, it should not, likewise, entertain the suit. In either case it must listen to the averments of a party who apparently pleads his own turpitude. And so Mr. Pomeroy properly insists that the remedy of cancellation or injunction “is simply the equitable proceeding identical with the setting up the ille *219 gality as a defense to defeat a recovery at law, and thus to get rid of the contract as a binding executory obligation.” Eq. Juris. § 940; and, in this, he is sustained by the authority of Mr. Adams, as will be seen by the quotation before made.
All bets or wagers are not equally reprehensible in morals or opposed to public policy. This, as at common law, depends upon the character of the event upon which the wager is laid. In many instances the occurrence of the event will not, in and of itself, be a matter of any public consequence. A wager laid upon such an event, whilst it may influence the occurrence, is not likely to be of detriment to any one beyond its effect upon public and private morals. This is not so, however, in all cases. A bet on the price of whea,t at a future time, when it assumes the form of a fictitious sale of a number of bushels from one to another, necessarily influences prices by creating a fictitious demand for wheat; and, affecting as it does the material as well as moral interest of a people, its discouragement is demanded by every consideration of public policy, that can well influence the judgment of a court to take jurisdiction and grant relief. 2 Pom. Eq. Juris. § 941.
There is much practical wisdom in what is said by Tucker, J., in Woodson v. Barrett, 2 Hen. & Munf. 88, that “ the circulation of gaming bonds is an evil no less to be discountenanced than the giving of them. And no means are more likely to prevent the giving of them that to put an effectual stop to their circulation.” This is approved in Skipwith v. Strother, 3 Rand. 216, as a remark of “great strength and propriety.” In each of these cases the court cancelled a judgment that had been rendered upon a gaming security, after the defendant in each had had an opportunity to defend, and made default; and in the former, also, granted relief in favor of the sheriff, who had been sued for damages by reason of an error in executing an elegit issued upon the judgment, “ on the ground of the turpitude of the original transaction.” These cases involve the whole question, and leave nothing for discussion. Pom. Eq. Juris, n. 1, § 938.
None of the Ohio eases, when rightly considered, militate against the doctrine. The case of Cowles v. Raguet, 14 Ohio, *220 38, and the cases from which 'it arose in the course of a protracted litigation, present a somewhat curious application of the principle that, in granting relief against agreements based on immoral considerations, distinguishes between an executory and an executed contract. A note secured by a mortgage had been given for compounding a felony. In a suit upon the note the illegality of the consideration was admitted as a defense, on the ground that the contract was executory. Raguet v. Roll, 4 Ohio, 400. Afterwards, a like plea was admitted, aud for a like reason, in a soire faoias upon the mortgage to enforce payment. 7 Ohio, pt. 1, 76. But in an action of ejectment on the mortgage, subsequently brought, Roll, the mortgagor, set up the same defense as in the former case, but it was not allowed, the court holding that a mortgage is an executed and not an executory contract. 7 Ohio, pt. 2, 70. Note the somewhat obsolete grounds upon which the reasoning is placed by Grimke, J., in delivering the opinion at pp. 72 — 73. “Although,” he says, “a strong disposition existed once to treat a mortgage as a mere chose in action, and although individual judges were heard to declare that the money was the principal, and the land only the incident, * * * yet such is not now supposed to be the law. A mortgage is in reality a conditional fee, which is as large an estate as a fee-simple, though it may not be so durable.” "VVe suppose the law, as here stated, is not now the law anywhere; and yet it constitutes the rationale of that decision. Finally, in the case of Cowles v. Raguet, it was held, after much debate, that, notwithstanding the consideration of the note for which the mortgage was given as a security was illegal, and after the land had been recovered in ejectment upon the mortgage, the mortgagor had the right to redeem. We have but two remarks to make upon these cases by way of distinction : (1) The note was not based upon a wagering consideration, and so not within the exception taken by courts of equity upon matters of this kind; and (2) the distinction between an executed and an executory contract was recognized and intended to be applied in each of them, and whether rightly applied in the ejectment suit, or not, cannot affect its application in this case, since there is no *221 question here but that the contract remains executory — a check has been given but the money has not been paid. The case of Thomas v. Cronise, 16 Ohio, 51, was a suit by the relator to have a deed that he had executed and delivered for a lot he had bet and lost upon the gubernatorial election of 1842, to be declared void. From the statement of the court it appears that the winner was in possession under the deed. The relief was denied for the reason, as held, that the contract had been executed. Any statements of the judge in delivering the opinion outside of the case so made, were merely obiter. In Hooker v. De Palos, 28 Ohio St. 251, the action below was a suit by De Palos to recover of Hooker $500 paid on a contract by which H. had agreed to sell the plaintiff a certain farm to be put up as a prize in a lottery, for which he was to be paid part in money and part in tickets in the lottery, and the money sought to be recovered had been paid on this contract. The court treated the transaction “ as fully executed,” and denied relief. Of this case wc may make the same observations, that apply to Cowles v. Raguet — it was not a wagering contract, and had been executed. We submit that none of these cases conflict with the well recognized doctrine that a court of equity may, and upon principles of public policy should, when appealed to, order the delivering up and cancellation of negotiable securities that have been given for a gaming consideration. In all of them where relief was denied, the defendant was within the correct interpretation of the maxim in pari delicto potior est conditio possidentis, the maxim applicable to such cases, and not that which refers generally to the condition of the defendant, as pointed out by Professor Pomeroy : “ If the contract is still executory, the promisor is left undisturbed in the possession of the money or other property which he agreed to pay or transfer; if the contract has been executed, the promisee is left undisturbed in the possession of money or other property which has been paid or conveyed to him. This is the true meaning of the maxim, and it involves no requirement that the contract, as a mere executory instrument, should remain unmolested; it deals *222 solely with the rights flowing, or which would flow from the agreement.” Pom. Eq. Juris. § 939.
The fact that the Statute 9 Anne, c. 14, provided for a discovery in aid of an action to recover back money lost at gaming, was not the ground on which courts of equity granted relief against gaming securities. The jurisdiction had been exercised, long prior to that statute. Fonb. Eq. note c, supra. Moreover, our statute not only declares all securities given for wagering considerations void, as did the Statute of Anne, but goes farther, and declares all wagering contracts to be void, § '4269, Revised Statutes; and, like the Statute of Anne, gives an action to the loser for a recovery of the money lost § 4270; and such has been the law since 1831, S. & C. 664.
It is true that Bispham seems to treat a gaming security, so far as relief in equity is concerned, as in the same catagory with all other securities based upon an illegal consideration. He cites no. cases nor authorities, and it is more than likely that the doctrine as to such securities had escaped his attention. ' If, however, he is to be understood as stating what is claimed from his text, he is unsupported by any other writer on equity jurisdiction, that I have been able to consult. In' addition to the citations heretofore made, I cite Snell’s Eq. 518; and Willard’s Eq. Juris. 225. The former observes that the jurisdiction is based on the ground that it is “better to prevent than relieve,” and the latter asserts that “ there is no doubt” about its existence. After a diligent search, I have been able to And but one case, Weakly v. Watkins, 7 Humph. (Tenn.) 356, decided in 1846, in whieh a contrary doctrine has been directly held. In a suit to enjoin a judgment that had been rendered pro confesso on a sealed bill on the ground that it had been given for a wagering consideration, the chancellor had decreed for the plaintiff. The decree was reversed by the Supreme Court, the judge delivering the opinion saying that he “ could see no difference in the position of the winner or loser so far as (relates) to their rights in becoming active movers upon such contracts in the courts.” The court differed with the chancellor, who was doubtless more conversant with the doctrine of equity on the subject *223 than the judge who delivered the opinion of the court. He failed to preceive that the action by the loser is simply sub- j servient to a wise public policy, and not on the contract at all.
The learned judge, in the cases he has cited in support of the opinion of the majority, seems to overlook or does not regard, the difference between an executed and an executory contract; and that gaming securities have, for reasons before stated, been singled out by courts of equity as proper subjects for relief by cancellation or injunction, although the parties may be in pari delicto.
I think the judgment should be affirmed.
Speajr, J.
The principle of most consequence in the case seems to be one of public policy. Which will best conserve the public interest, to allow relief to one in the circumstances which surround the defendant in error, Walton, or to refuse it? When a court, in disposing of a case, has declared a correct principle of law, and correctly applied it, a like application should be made in a subsequent case involving a like principle. In Barholt v. Wright, 45 Ohio St. 177, where a party provoked a quarrel, made the first assault, and then got worsted in the combat, the court held that the assailant had a a right of recovery for damages accruing from the excess of resistance used by his opponent. If a party thus circumstanced may have a standing in court to have his self-invited wrongs righted, in an action at law, by a verdict and judgment which will inflict pecuniary loss on the other party, (and the authorities seem to warrant the holding), it is not easy to see why one who has engaged in a gambling contract, though it be an unlawful transaction, may not have a standing in a court of equity, and ask that court to extend its aid in preventing his more lucky accomplice from enjoying the usufruct of his ill-gotten gains; and if breaches of the peace are more discouraged by giving the defeated party, though the aggressor, and a violator of the criminal law, a right of action and the opportunity to use the courts of the state to enforce it in the former ease, than by refusing it, it would seem that a like policy would be subserved by giving *224 the unlucky loser tbe aid of equity, in tbe latter. The maxim that one asking aid of a court of equity must come with clean hands, is not forgotten, but,i along with it is another maxim, that a court of equity will follow the analogies of the law. And the court, having fixed the rule of law in the case referred to, ought not, it is respectfully submitted, to hesitate to apply the rule to the case at bar. Following the principle of that case, I think the judgment of the district court .should have been affirmed.