### OSBORNE *et al.* v. BARGE *et al.*

*(Circuit Court, N. D. Iowa, C. D.* May 9, 1888.)

**PARTNERSHIP — POWER OF PARTNER TO BIND THE FIRM — CHATTEL MORTGAGE OF STOCK—FRAUDULENT PREFERENCE.**

A large creditor of B. & K., fearing that they were insolvent, dispatched an agent to obtain security. The partners met on Saturday, and promised to save the agent harmless, B. to give a mortgage on his individual property on Monday. An examination was made of the books, and, they clearly showing insolvency, both partners agreed to make a general assignment. Schedules were accordingly prepared, and instructions given the firm's attorney to have the papers ready for execution Monday morning. Sunday night K. went with the agent to another attorney, and was there induced to agree to execute a mortgage on the stock in trade in favor of the creditor by a promise of a position in his employ. The following morning K. refused to join in the assignment unless the creditor was first secured. and, B. not assenting to this, K. signed the mortgage in the firm's name, and delivered it to the agent. This mortgage authorized the mortgagee to take immediate possession and sell. B., who knew nothing of the mortgage until demand was made under it for possession, then executed the assignment in the firm name, and turned the property over to the assignee. *Held*, on bill to foreclose, that under the circumstances, according to the rule in Iowa, the mortgage was fraudulent and void.

In Equity. Bill to foreclose a chattel mortgage.
*Martin & Wamback* and *Wright & Farrell*, for complainants.
*W. J. Covil* and *Kamrar & Boyes*, for defendants.
Before BREWER and SHIRAS, JJ.

SHIRAS, J. Complainants in this cause seek the foreclosure of a chattel mortgage executed in the firm name of Barge & King, and covering substantially the stock of goods formerly owned by the firm at Webster

City, Iowa. The question before the court is as to the validity of this mortgage, and it arises under the following facts: In November, 1886, the firm of Barge & King, carrying on business at Webster City, had become insolvent, being indebted to complainants, among others, in a sum exceeding $2,000. An agent of the complainants visited Webster City for the purpose of endeavoring to get security for the debt due them. At an interview, at which both the members of the firm were present, he was assured that security would be given him on realty owned by B. F. Barge, the understanding being that by the following Monday—the interview taking place on Saturday—Barge would select the property upon which the security was to be given. During Saturday and Sunday the members of the firm made an examination of the condition of their business, and it then became apparent to them that the firm was insolvent, and the conclusion was reached that the best thing to be done was to make a general assignment for the benefit of creditors. For this purpose schedules of the firm property and debts were made out, directions given to their attorneys to prepare the deed of assignment ready for execution on Monday morning, and a discussion had as to the proper person to act as assignee, Robert Fullerton being finally agreed on for the position. On Sunday evening complainants' agent, with Mr. King, visited the office of complainants' attorneys, and remained there until about 3 o'clock Monday morning. During this time the chattel mortgage in question was drawn up, covering the stock in trade of the firm, and authorizing the mortgagees to take immediate possession of the mortgaged property, for the purpose of selling the same. The influences brought to bear upon King to induce him to give the chattel mortgage are readily discernible. He had previously been in the employ of D. M. Osborne & Co. He knew that the business of the firm was at an end. Complainants' agent himself testifies that "he said to him that it was by no means right or proper for him to engage in the practice of bad faith, after making for himself a good record in the employment of D. M. Osborne & Co., who were constantly in need of many men to carry on their business; and no one at his age, under such circumstances, could afford to lose the respect which it had taken so many years to gain." The evidence shows that King, within 30 or 60 days after the execution of the mortgage, was taken into the employ of D. M. Osborne & Co., and is still with them. The result of the pressure and influence thus brought to bear upon King was manifested on Monday morning, when King refused to sign the deed of assignment unless the claim of D. M. Osborne & Co. was first secured, regardless of the fact that, had such security then been given, it would, under the Iowa statute, have destroyed the validity of the assignment. The fact of the preparation of the chattel mortgage, the same having been signed and acknowledged by King on Monday morning, was studiously concealed from Barge; and when the latter notified complainants' agent that he would not secure that claim, but that all must share alike, then King gave the agent the chattel mortgage, which was at once filed for record. In the mean time, upon King's refusal to sign the deed of assignment, Barge executed the same in the

firm name. Complainants' agent then endeavored to take actual possession of the firm property under the mortgage, which was resisted by Barge and the assignee under the deed of assignment, and, failing in securing the control of the property, the complainants brought the present proceeding for the purpose of foreclosing the mortgage. B. F. Barge, in his own name and in the name of the firm, denies the validity of the mortgage, as does also the assignee under the deed of assignment.

Thus the question is presented whether the mortgage is valid and binding upon the firm and its property, under the circumstances developed in the testimony. That one partner may, for the purpose of procuring money to continue the business of the firm, or for the purpose of securing or paying the firm indebtedness, or for any other purpose in furtherance of the business of the partnership, sell or incumber the property of the firm in whole or in part, is not questioned, subject, however, to the qualification that, if the immediate and necessary result of the transfer will be to put an end to the firm business, then ordinarily the actual consent of the other partner is required to give validity to such transfer. Bates, Partn. § 403. The power of a partner to bind the firm arises from the fact that each partner is deemed to be an agent of the firm, and the extent of the power to bind the firm in a given case is a question of agency. *Irwin* v. *Williar*, 110 U. S. 499, 4 Sup. Ct. Rep. 160. In the absence of special limitations in the articles of partnership, each partner has the authority to do any and all acts which, from the nature of the business as generally conducted, may be deemed reasonably intended to further the partnership interests. The payment of the firm debts is usually in furtherance of the business, and hence the application of the firm property in payment or by way of security of the firm debts is within the power of the partner. It is, however, held that one partner has not the right, without the assent, express or implied, of his copartner, to make such a disposition of the firm property as that it necessarily terminates the business of the firm, and, by depriving the firm of the control and management of the property, virtually dissolves the partnership. Thus it is held that one partner has not the right to execute a general assignment of the firm property for the benefit of creditors. By the assignment the property is appropriated to the payment of the debts; and in ordinary commercial partnerships, whose business it is to buy and sell property, each partner has the right to sell property kept for sale, and to pay the firm debts; but the right to make a general assignment is denied to a single partner, because, in effect, the assignment ends the partnership, and deprives the firm of the present control of the property. Bates, Partn. § 338. In *Loeb* v. *Pierpont*, 58 Iowa, 469, 12 N. W. Rep. 544, the supreme court of Iowa holds that one partner has not the power to execute a general assignment of the firm property without the assent, express or implied, of the copartner. In the opinion it is said:

"It would appear upon principle that such power is not possessed by a partner. Under its exercise the business of the firm may be, and, under almost all circumstances, would be, destroyed, and the partnership itself practically dissolved as to future business. It is true that, theoretically, the assignment

is for the purpose of effecting the payment of firm debts, and that the law allows one partner to use the property of the firm to discharge the indebtedness; but this rule of law is applied to transactions occurring in the ordinary business of the firm, and does not authorize one partner, upon the exercise of his individual discretion, to terminate the business of the copartnership. In a matter of such great importance to each partner both ought to be consulted, and be permitted to determine whether the condition of their affairs requires them to transfer all their property, and abandon their business."

In *Hunter* v. *Wayneck*, 25 N. W. Rep. 776, the question was whether a sale of the entire partnership property, made by one partner without the assent of the copartner, could be sustained, and the supreme court of Iowa held that it could not, saying:

"That it is said there is some conflict of authority as to the power of one partner, without the knowledge or assent of his copartner, to sell or assign all the partnership property. Conceding this to be so, such question must be regarded as settled in this state. It was held in *Loeb* v. *Pierpont*, 58 Iowa, 469, 12 N. W. Rep. 544, that one partner did not have such power, when his copartner resided in the same town and could have been readily consulted. * * * Practically the plaintiff was present when the sale was made, and yet he was not consulted. The appellant had knowledge of the partnership, the residence of the plaintiff, and that he was not consulted."

The evidence showed that the copartner resided about 75 miles from the place where the firm business was transacted. The court held that, as he was not consulted, the sale was void for want of authority in the one partner to make it.

From these authorities it would seem to be the rule in Iowa that the general power of a partner to sell the property of a firm kept for the purposes of sale, and to appropriate the firm property for the payment or securing of the firm debts, is nevertheless subject to the limitation that one partner cannot, without the assent, express or implied, of the copartner, even for the purpose of paying or securing the firm debts, make such a disposition of the firm property as that it, *ipso facto*, terminates the business of the firm, by depriving the partners of the control and management of the property, without which the partnership business cannot be conducted.

On behalf of complainants it is forcibly urged that, while the great weight of authority sustains the proposition that one partner has not the power to execute a general assignment, it is equally well settled that one partner may execute a chattel mortgage to secure a firm debt upon the entire property of the firm. Does it follow, however, that because many chattel mortgages are sustained, that all must be? Is it not the effect of the transfer, rather than its mere form, which is to be considered? In *Loeb* v. *Pierpont* the transfer in form was an assignment, and in *Hunter* v. *Wayneck* it was an absolute sale, yet both were held void for the same reason. The power to mortgage is included in the power to sell, and is derived from it, and it is difficult to see why the same limitation should not apply to both modes of transfer; that is to say, if the contract between the creditor and the one partner contemplates an immediate change in the possession and control of the partnership assets, so that, in effect,

its necessary result is to work an immediate destruction of the firm business,—on which ground the supreme court of Iowa holds that one partner, without the assent of his copartner, cannot assign or sell the partnership property as a whole,—it is difficult to see how such a contract can be sustained simply because it is made in the form of a chattel mortgage. Furthermore, the authorities that support the doctrine of the right of one partner to execute a chattel mortgage on the firm property mainly place reliance upon the fact that the creditor seeking to obtain security for his debt—as he has a right to do—is justified in assuming that sales or transfers of firm property made by one partner are made with the assent of the copartner. When the business of the firm is that of buying and selling, it follows that ordinarily each partner, as an agent of the firm, has the right to sell the property bought for the purpose of sale, and the creditor has the right to assume that each partner has the authority to dispose of the property in furtherance of the partnership business. After the sale or transfer has been made, it is too late for the one partner then to claim that, as to the particular transfer, no authority existed to make it; for the transferee has the right to rely upon the authority or power which the partner apparently had. If, however, it appears that the transferee knew at the time the transfer was made that it was made by one partner contrary to the will of the copartner, then he certainly takes the property at his peril; and if, in fact, as between the partners, the particular transfer was *ultra vires*, upon what ground can it be sustained in favor of the creditor? The right of one partner to give, and of the creditor to take, security upon firm property, by way of chattel mortgage or otherwise, executed by one partner, is not questioned, so long as the particular transaction does not come within the doctrine of the supreme court of Iowa, that it is not within the power of one partner, upon the exercise of his individual discretion, to make transfers which, in effect, immediately terminate the business of the copartnership.

The evidence in this case shows clearly that the arrangement between complainants and King contemplated the immediate taking possession of the mortgaged property. King handed the keys of the store building in which the property was situated to complainants' agent upon the delivery of the mortgage, and the latter at once endeavored to oust Barge from the possession and control of the property. With complainants in full possession and control of the mortgaged property, the business of the firm would have been ended; and hence the contention of the defendants that the transfer, regardless of its mere form, must be held to be beyond the power of one partner to make without the consent of the copartner. Whether the fact that the transfer of the property is under the guise of a mortgage takes the case out of the operation of the rule laid down by the supreme court of Iowa in cases of assignments and absolute sales, has not, so far as we can discover, been decided by that court; and we are disposed to leave it for future consideration, in the hope that should it arise we may then have an authoritative decision by the supreme court of Iowa for our guidance in determining it.

The validity of the mortgage is further questioned on the ground that in fact it is a fraud upon the firm and the partner Barge. As already stated, the two members of the firm, upon mutual consultation, had reached the conclusion that a general assignment for the benefit of creditors should be made, and the schedules therefor had been prepared and directions given for the preparation of the deed of assignment, so that the same could be promptly executed on Monday morning. On Sunday night King was induced to consent to the preparation of the chattel mortgage, but all knowledge thereof was kept carefully concealed from his copartner. The legal effect of this instrument, when delivered, would be to enable the mortgagees to take the immediate possession and control of the stock in trade, and deprive the partners of the management and right of sale thereof; and the evidence shows that it was the understanding between King and complainants' agent that the latter should take the immediate possession of the property. Moreover, the execution of the mortgage would necessarily result in giving complainants a preference over other creditors, and thereby destroy the validity of the general assignment, if the same should be executed as agreed upon. No elaboration of the facts is needed to show that the execution of the mortgage, under the circumstances, was a transaction of such a nature that good faith required King to consult with his partner before the execution thereof. Not only did he not consult with him, but care was taken to keep all knowledge of it from the partner until after its delivery. The motives that induced King to do as he did are apparent. He realized that the firm business was at an end. His personal interests would be best subserved by meeting the demands of complainants. For the purpose of preserving his standing with his former employers, and to insure his re-employment by them, he was willing to secretly collude with complainants, and, by the execution and delivery of the mortgage without the knowledge of his copartner, prevent the carrying out of the agreement existing between himself and his copartner touching the disposition of the property of the firm. As between the partners, such secret action on part of King was fraudulent and void. It cannot be permitted to one partner to secretly dispose of the firm property for his own private and personal advantage. Complainants can claim no better position, nor greater rights, than the partner King. When the mortgage was executed and delivered their agent knew that it was so executed and delivered without the knowledge and consent of the partner Barge, and that, practically, it was in fraud of his rights. The agent knew the motive that had influenced the action of King, and in fact was the prime mover in the transaction. Complainants, therefore, were active participants in the fraud sought to be perpetrated on King's copartner, and as such cannot ask a court of equity to enforce an instrument thus tainted with fraud. The bill of complainants is therefore dismissed on the merits, at their cost.

BREWER, J. I concur in the conclusions reached by my Brother SHIRAS, and upon these grounds:

1. The decisions of the supreme court of Iowa seem to point in that direction, and, though upon a question of general commercial law, are persuasive, at least, in a federal court in this state.

2. The misconduct of complainants in their dealings with King. Equitably, the property of an insolvent firm should be distributed *pro rata* between all creditors. Each partner has a right to insist upon this; and improper inducements to one partner, by which such equity is sought to be defeated, ought not to be encouraged. A court of equity should incline generally against preferences, and, when attempted to be accomplished in the manner this was, may properly refuse its aid. Hence, without questioning the general doctrine of the power of all partners as to sales and mortgages, I concur in the conclusion reached in this particular case.