ROBERT APPLETON, Appellee, v. W. A. MAXWELL, Appellant.

SYLLABUS BY THE COURT.

GAMBLING—MONEY LOANED THEREFOR NOT RECOVERABLE, WHEN.—
Where money is loaned or advanced with the understanding between the parties, that it shall be used in gambling, or where the party advancing the money, participates and shares in the gambling transaction thus promoted by his act, such party becomes *particeps criminis*, and can not recover in a suit for the money loaned or advanced under such circumstances.

*Appeal* from judgment in favor of plaintiff from District Court of Bernalillo county. Reversed, and judgment with costs for appellant.

Facts will appear sufficiently from the opinion of the court.

JOHNSTON & FINICAL for appellant.

1. Wagering contracts are void both at common law and by statute.

While a few of the earlier English cases have in some instances upheld certain kinds of wagering contracts as valid at common law the later authorities have expressed a reluctance to follow the doctrine thus announced. There was a disposition on the part of some of the American courts to follow the English decisions, but for the past fifty years the trend of the decisions in this country has been decidedly against the validity of such contracts at common law independent of statute. The following are a few of the authorities holding all gaming contracts void as against public policy. Among them will be noted New Mexico and the Supreme Court of the United States. U. S. Irwin v. Williar, 110 U. S. 499-510; Colo. Eldred v. Malloy, 2 Colo. 321; Mass. Love v. Harvey, 114 Mass. 82; Oregon. Bernard v. Taylor, 23 Or. 416; New Hamp. Hoit v. Dodge, 6 N. H. 104; Ver. West v. Holmes, 26 Vt. 530; Maine. Gilmore v. Woodcock, 69 Me. 118; Ark. Jeffry v. Ficklin, 3 Ark. 227; Kan. Cleveland v. Wolf, 7 Kan. 184; Minn. Wilkinson v. Tousley, 16 Minn. 299; Iowa. Shannon v. Baumer, 10 Iowa, 210; Neb. Deaver v. Bennett, 29 Neb. 812; New Mex. Joseph v. Miller, 1 N. M. 621.

The great majority of the states now have statutes making gambling contracts void. New Mexico has such a statute, Comp. Laws, 1897, sec. 3202. So in New Mexico such contracts are invalid both at common law and by statute.

In 1876 the question was before the Supreme Court of this Territory in the case of Joseph v. Miller, 1 N. M. 621. The suit was on a note given as a wager on a horse race. After citing many cases holding such contracts void at common law, the court uses this language:

"Being untrammeled by precedents, this being the first adjudication of the kind in this Territory, we do not hesitate to lay down the same rule as to wagering contracts here. Not only do we hold that wagering contracts are void on sound principles of law, as being opposed to public policy and

good morals, but we hold also that contracts of this kind are void under the statute. Sec. 4 of chap. 36, page 246 of the Compiled Laws of New Mexico (Comp. Laws, 1897, sec. 3202) provides that 'all judgments, securities, bonds, bills, notes or conveyances, when the consideration is money or property won at gambling, or at any game or gambling device, shall be void.' "

It can hardly be doubted that this suit is an attempt to collect winnings at the card table. The defendant, Maxwell, states positively that the $105 claimed was the amount that Appleton figured out as coming to him when the game ended at 4 o'clock in the morning. He is corroborated in this statement by Quickel, the witness for plaintiff, and Appleton admits on cross-examination, page 5, that Jake Weinman won part of the money advanced, and of himself he says: "When the game closed, if Mr. Maxwell had paid me I might have been winner too, I won something, I think." Is it to be presumed that when the game closed and Appleton was "figuring" out the amount due him which he says was $105, that he made no account of his winnings? We hardly think so. "Loans" of this kind are but a thin and very common disguise to enable winners to recover. Courts easily see through such a veil.

"This lending must not be a device of one of the parties to the contract to enable the winner to sue the loser for his losses, for the law pierces disguises of this sort, and will not allow the winner to recover from the loser by a subterfuge." 14 Am. and Eng Ency. Law (2 Ed.), page 642, cases cited.

2. A loan made for gambling purposes can not be recovered where the party making the loan was a participant in the gambling transaction.

The law seems too well established that where a loan is made for the purpose of enabling the borrower to engage in gambling, such loan cannot be recovered in the courts.

"Where the understanding between borrower and lender was that the money should be used for gambling, the lender can not recover." 14 Am. and Eng. Ency. Law (2 Ed.), page 642, and cases cited; Waugh v. Beck, 114 Pa. St. 422; 60 Am. Rep. 354; Morgan v. Groff, 5 Denio, 364; 49 Am. Dec. 273; Williamson v. Baley, 78 Mo. 636; Raymond v.

Leavitt, 46 Mich. 447; Higgins v. McRae, 116 U. S. 671.

But where the loan was made by a participant in the gambling transaction, the courts are still more emphatic in their refusal to allow recovery. This is the settled doctrine of the Supreme Court of the United States whose rulings by statute are binding upon this court. Irwin v. Williar, 116 U. S. 499. loc cit. 510; Embrey v. Jamison, 131 U. S. 336; Shaffner v. Pinchback, 133 Ill. 410; Tyler v. Carlisle, 79 Me. 210; White v. Wilson Heirs, Ky., 38 S. W. 495; Plank v. Jackson, Ind., 26 N. E. 568.

The case of Irwin v. Williar, supra, was one where a broker advanced money and performed services for a party dealing in futures, the differences to be settled in cash instead of grain, a gambling contract. The court refused the broker to recover for money thus advanced, saying:

"But we are also of the opinion that when the broker is privy to the unlawful designs of the parties, and brings them together for the very purpose of entering into an illegal agreement, he is particeps criminis, and can not recover for services rendered or losses incurred by himself on behalf of either in forwarding the transaction."

The case of Embrey v. Jamison, supra, was very similar to the Irwin case and the court uses the following language:

"We are of the opinion that upon principle, the original payee can not maintain an action on a note, the consideration of which is money advanced by him upon or in execution of a contract of wager, he being a party to that contract, or having directly participated in the making of it in the name of or on behalf of one of the parties."

In Plank v. Jackson, supra, the court uses this language:

"And where the person loans money, and as a part of the arrangement it is to be used in such speculative contracts, and he is interested in such contracts, or assists in bringing the parties together, and aids in consummating such contract by conspiring with and urging and aiding the party to whom he loans the money to make such investments, and loans him the money to be so invested, then he becomes a particeps criminis, and the law will not aid him to collect the money he parted with under such circumstances."

Here Appleton assisted in bringing the parties together. He was the proprietor of the gaming privileges in the Quickel saloon. He furnished the place and conveniences of the meeting. He was a participant in the game. Not until after Appleton sat down in the game was the alleged loan made. It was made for gaming purposes. Appleton was a particeps criminis and can not recover.

Recovery can not be had on the theory that the money sued for was for a loan to settle up some past gambling debt. The evidence does not support any such theory. While Appleton testifies on redirect examination that money was borrowed to settle for some games he owed Quickel, Weinman and others, on cross-examination he said, "I can not say positively, I can not say that I loaned him $105 then, but he owed me $105," and later on he admits Weinman won part of the money and he, Appleton, might have been winner, too, had Maxwell paid him; all this goes to show that his own witness, Quickel, and Maxwell told the straight story when they said that at the end of the game Appleton "figured" that Maxwell owed him $105.

No amendment of the answer was necessary to show wagering contract. A general denial was sufficient. Oscan-yan v. Arms Co., 103 U. S. 261; Joseph v. Miller, 1 N. M. 621.

We respectfully submit this case confidently believing that this court will not permit a particeps criminis in a gambling transaction to recover either his winnings or his stakes or loans advanced during the progress of the game, and that the case will be dismissed.

HORTON MOORE, attorney for appellee.

1. Money loaned to pay loss already incurred at gambling can be recovered by lender, in the absence of a special statute to the contrary.

The evidence shows that Maxwell had been playing five or six hours when Appleton came in, whereupon he immediately borrowed money from Appleton. And Appleton testified the money went to pay Jake Weinman, Ed. Quickel and several other parties whom he could not recall. Of course Maxwell denied this, and who that would go into court, would

admit that he used a man's money to gamble against him, gambling act, but would make up his testimony to comply with the act?

Who should the court below have believed? The man who told the truth as he saw it without regard to the lawful right of recovery. 14 Am. and Eng. Ency. Law (2 Ed.), page 642.

2. The mere knowledge of the lender that the money is to be used for gambling purposes, does not prevent him from recovery, in the absence of special statute. 14 Am. and Eng. Ency. Law (2 Ed.), page 640, and cases cited.

We have no such special statute, hence unless the court believed that it was one of the conditions upon which the money was parted with, he could not have found for defendant. And I submit no court could have found thus, from the evidence adduced.

It is respectfully submitted that no question is presented by the record or the brief of appellant, properly reviewable in this court, or upon the review of which any reversal can be made. The judgment of the court below should be affirmed.

McFIE, J.—Appellee brought suit in the court below for the sum of one hundred and five dollars ($105.00) and interest at six per centum alleged to be due thereon. Jury being waived, trial was had before the court May 25, 1900, and judgment was rendered for the plaintiff for the sum of one hundred and five dollars and costs. From this judgment an appeal was taken to this court by the defendant.

The complaint is in the usual form, and alleges money loaned to the defendant, and the answer is general issue.

The court below made no findings of fact, so far as the record discloses, but the judgment recites that the court found the issues for the plaintiff. The facts disclosed by the record wholly fail to sustain the judgment of the court below in this case. The plaintiff below, appellee in this case, seeks to recover from the defendant $105.00 and interest upon the ground that he loaned the defendant that amount to pay an existing indebtedness to other parties, and while upon direct examination he testified to this effect, upon cross-examination he admits that this was the amount

found due him upon a settlement at the close of a night's gambling at cards in which plaintiff, defendant and two others participated. He also admits that the money 'advanced by him was used in the game, thus destroying his claim that the money was used to pay a pre-existing indebtedness to third parties. These are admissions against interest which bind the appellee, so that his own testimony destroys his claim that the transaction was a loan, and sustains the defense, that it was a gambling transaction in violation of the statute and for which there could be no recovery. There were only two

GAMBLING: money loaned therefor: not recoverable, when.

additional witnesses who testified in the cause, both of whom testified, that the money was used in the game, and the money sued for, was the amount found due on settlement, at the end of the game. The defendant denied that he borrowed the money, but admits that when he and the plaintiff settled at the end of the game the amount sued for was the balance due the plaintiff. Upon these facts, it is idle to call the transaction a loan in a legal sense; it was nothing more nor less than a gambling transaction in violation of the statute and any implied contract or obligation to pay, was not a legal obligation, enforcible in the courts of this Territory. To call this matter a loan is clearly a device to avoid the provisions of the statute concerning gambling, and the law will not tolerate subterfuges for this purpose. As was said in 14 Vol. Am. & Eng. Ency. of Law, 642.

"This loaning must not be a device of one of the parties to the contract to enable the winner to sue the loser for his own losses for the law pierces disguises of this sort, and will not allow the winner to recover from the loser by subterfuge."

The first assignment of error is: "The court erred in holding that a gambling contract could be enforced at law."

The second is: "The court erred in rendering judgment in favor of the plaintiff, Appleton, and against the defendant, Maxwell."

As to the law of this case, there is little, if any, controversy between counsel for appellant and appellee. At com-

mon law certain wagering contracts were held valid and the early English precedents sustained such contracts, with few exceptions. Some of the American courts followed the early English precedents, but while these early English precedents were in many instances followed, regret was expressed on the part of some of the judges, and they felt constrained, out of respect for precedent, to sustain such a doctrine. After the enactment of the statutes of Charles II, and the IX. Anne, the doctrine announced by the English courts based upon these statutes was entirely different from that announced in the early cases, and gaming, gambling and wagering contracts were held void by those courts. Owing to the regret expressed by different courts, that they felt constrained to sustain the doctrine of the early English decisions in deference to precedent, many years ago and prior to the enactment of statutes by the different states, the courts began to repudiate the doctrine of the common law as to gambling and wagering contracts; and upon examination it will be found that the New England states, Pennsylvania, South Carolina, Massachusetts, Vermont, Minnesota, and other states, repudiated the common law doctrine. In the case of Amory v. Gilman, 2 Mass. 5, the court said:

"It would seem a disgraceful occupation for the courts of any country to sit in judgment between two gamblers in order to determine which was the best calculator of chances, or which had the most cunning of the two."

A leading case, and one which gives the reason for the repudiation of the common law rule more fully than the others, is the case of Wilkinson v. Tousley, 16 Minn, 299, in which case the authorities are collated and examined, states the case as follows:

. "From the foregoing citations from the statutes which of late years have been enacted in England against bets and wages, as well as from the common knowledge of the prevailing public sentiment on this subject, we think the remark found in Second Smith's Leading Cases, (6 Am. Ed. 343), that 'the moral sense of the present day regards all gaming or wagering contracts as inconsistent with the

interests of the community, and at variance with the laws of morality' is abundantly justified  *   *   *   *   *   *. In determining, then, what is the law upon this subject here, we are forced to lay down such rules as are most in accordance with general principles and with the best considered and most wholesome views which have been expressed by other tribunals.  *   *   *   *.  In announcing a rule where none has been before announced, the question is whether we shall blindly adopt a doctrine which is admitted to have been originally wrong, both in morals and in law, and from which the courts of England would gladly escape were they not hampered by precedents; or whether we shall give full scope to the broad principle that contracts contrary to good morals and sound public policy are invalid, and that, therefore, wagers and contracts of that character are not to be sustained.   We have no hesitancy in adopting the latter course."

Numerous other cases might be cited to the same effect, but it is not deemed advisable to multiply them here. In 1876 this court was called upon to consider this subject in the case of Anthony Joseph v. Frederick Miller et al., 1 New Mexico, 621.  This was a suit to collect a note, the consideration of which was a bet upon a horse race.  The court in an elaborate opinion by Associate Justice Bristol sustained the lower court in holding that the wager was not a valid consideration for a contract, and referring to the case of Wilkinson v. Tousley, held that the collection of the note could not be enforced in the courts of this Territory:

"Being untrammeled by precedents, this being the first adjudication of the question in this Territory. we do not hesitate to lay down the same rule as to wagering contracts here.  Not only do we hold that wagering contracts are void on sound principles of law as being opposed to public policy and good morals, but we hold also that contracts of this kind are void under the statute.  Section 4 of chapter 36, page 246, of the Compiled Laws of New Mexico provides that 'all judgments, securities, bonds, bills, notes, or conveyances when the consideration is money or property won at gambling, or at any game or gambling device

shall be void,' etc.    The word 'Gambling' is a word of very general application and is not restricted to wagering upon the result of any particular game or games of chance. In the adjudicated cases on this subject, we find that judges often have applied this word indiscriminately to wagering of all kinds. We are unable to discover any distinction in general principles between the various methods that may be adopted for determining by chance who is the winner and who is the loser of a bet—whether it be by throwing dice, flipping a copper, turning a card or running a horse race. In either case it is gambling. This is the popular understanding of the term 'Gambling device,' and does not exclude any scheme, plan, or contrivance for determining by chance which of the parties has won and which has lost a valuable stake. That a horse race when adopted for such a purpose is a 'gambling device,' there can be no doubt."

It will thus be seen that this court as early as 1876 announced the doctrine that contracts originating in gambling devices, of all kinds were contrary to public policy and would not be enforced by the courts. But the court in the same case, also declares, that the same are void under the statute of this Territory which was in force at the time this decision was rendered. In addition to the provisions of the statute quoted, by the court, in the case of Joseph v. Miller et al., we find that numerous provisions have been added to the statute all tending to destroy contracts or obligations tainted, or in any way connected with gambling devices. Section 3199 provides that any person who shall lose money or property at any game at cards or any other gambling device may recover the same back by an action at law. Not only may the person himself recover money or property lost by him through gambling devices, but section 3201 provides that the wife, children, executors, administrators and creditors of the person losing, may also recover back money or property lost at gambling. Section 3203 provides that the assignment of any bond, bill, note, judgment, conveyance or other security shall not affect the defense of the person executing the same. And there are numerous other provisions of the statutes of this Territory

which show conclusively that gambling devices are illegal,
and that the courts will not aid the winner in the enforce-
ment of contracts or in the recovery of money or property
won through gambling devices, or wagers in violation of
the statute.   The section of the statute construed by this
court in the case of Joseph v. Miller et al. was enacted in
1857; and although the section does not specifically men-
tion horse racing, the court held, that money won in betting
upon a horse race placed the transaction in the category of
gambling.  The case of Joseph v. Miller et al. was not as
strong as the case at bar, in this, that gambling, such as
the evidence shows in this case, is expressly within the
terms of the statute.   The statute of this Territory just
referred to, is almost identical with the statute of Missouri
which was construed by the supreme court of that state,
in the case of Shropshire v. Glasscock et al., 4 Mo. page
316.   About the only material difference between these
statutes was the insertion of the word "gambling" in two
places by our statute in the section, instead of one as in
the Missouri statute, so that the statute of this Territory is
more forcible in its terms than that of Missouri, betting
upon a horse race was not specifically mentioned in the
Missouri statute, but the court held it to be equally pro-
hibited with other forms of gambling, such as with cards,
dice, etc., and that the term "other game or games" was
sufficiently broad to include horse racing and was intended
to prohibit all kinds and modes of gaming.

      Counsel for appellee did not seriously question the law
as contended for by the counsel for appellant, but insisted
upon two propositions, which he contended, were sup-
ported by the facts:   First, that money loaned to pay a
loss already incurred at gambling can be recovered by the
lender in the absence of a special statute to the contrary,
and, second, that the mere knowledge of the lender that
the money is to be used for gambling purposes does not
prevent him from recovering, in the absence of a special
statute, and counsel refers the court to the 14th Volume of
Am. Ency. of Law, second edition, pages 640-2, and the
cases there cited.   The facts do not sustain the first proposi-
tion of counsel for appellee, that this money was loaned to

pay a loss already incurred, therefore, the first proposition of counsel, is not in point. It is true, as stated in the second proposition, that the mere knowledge of the lender that the money is to be used for gambling purposes does not prevent a recovery in the absence of special statute. This proposition is supported by very respectable authority; but it is not supported, nor is it applicable to the facts in this case, as we have arrived at the conclusion, that the money advanced to the appellant in this case was not a loan, nor was it so understood at the time. But where money is loaned or advanced with the understanding or agreement between the parties that it shall be used in gambling, or where the party advancing, or even loaning the money, participates and shares in the gambling transaction thus promoted by his act, he thereby becomes a particeps criminis and can not recover for money loaned or advanced under such circumstances.

In the case of Oliphant v. Markham, 79 Texas 543, the court held that while simple knowledge of what the borrower was going to do with the money would not defeat the lender's right to recover; he could not recover if he had taken any active part in the gambling contract, such as depositing the loan as margins, bringing the parties together, etc.

In the case of Snodheim v. Gilbert, 117 Ind. 71, the court upon this subject says:

"In order to invalidate a note, or other security in the hands of one who advanced money with which the borrower intended to and did employ in carrying on an illegal enterprise, it has been held that it was not enough to defeat recovery that the lender knew the borrower's purpose. He must have been in some way implicated as a confederate in the specific illegal design under contemplation. It must have been a part of the contract, or there must have been in some way such a combination of intention between the lender and the borrower that the money furnished should be used in aid of and to promote the unlawful enterprise as by that the former became particeps criminis."

See, also, Irwin v. Williar et al., 110 U. S. 499; Embry v. Jemison, 131 U. S. 336.

In the case at bar, the proof shows, that the money advanced by the appellee was put up from time to time during the progress of a gambling game, in which he participated as one of the principals. The testimony of all the witnesses being to the effect that the money advanced was used during the progress of the game. It will not do for the appellee in this case to say, that he did not know that this money was to be used for gambling purposes, because he participated in the game, and in its use for that very purpose; and while possibly the simple knowledge that it was to be used for gambling purposes, might not be sufficient to defeat a recovery, the participation of the appellee in the unlawful purpose for which the money was advanced and to be used in his presence, is quite sufficient to make him particeps criminis in law, and as such, he cannot recover. Indeed he participated in another way. It is reasonable to believe that the production of this money by the appellee, after the appellant's money was exhausted, had the effect of continuing and prompting the gambling being carried on at the time, and the continuing participation of the appellant in the game; and in this way, also, while it may not be said that the appellee was instrumental in bringing the parties together for the unlawful purpose of gambling, it is undoubtedly true that his participation had the effect of continuing the illegal transaction in which the parties were engaged at the time. The appellant admits in his own testimony that he was a winner to some extent during the game, the exact amount he does not state. Undoubtedly, however, the money won by him during the progress of the game, constituted at least, part, if not all, of the balance which he claimed to be due him from the appellant. Therefore, the entire indebtedness claimed arose out of a gambling transaction in violation of the statutes of this Territory, and the courts will not lend aid to a winner whose alleged claim arose out of a gambling transaction in which the creditor participated.

From the views above expressed, it follows that the assignments of error numbered one and two above quoted in this opinion were well assigned, and that the court below erred in rendering judgment for appellee, and the judgment

of the court below will, therefore, be reversed, and judgment for appellant for costs.

Parker and McMillan, JJ., and Mills, C. J., concur; Crumpacker, J., having tried the case below, took no part in this decision.

---

[860.  February 28, 1901.]