**GASTON, WILLIAMS & WIGMORE OF CANADA, Limited, v. WARNER.**

(Circuit Court of Appeals, Second Circuit. March 2, 1921.)

No. 123.

1. Sales ⊙⟝2—Law of domicile does not always govern transfers of personalty.

    The domicile of the owner is not always controlling as to the law which governs a contract for the sale of personal property, but such sale may, like all sales of land, be governed by the law of the place where the property is situated.

2. Shipping ⊙⟝33—Sale passes title, regardless of registration.

    As between the parties, the sale and delivery of a vessel passes the title at common law, regardless of the question of registration, which is

⊙⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not compulsory, but a privilege, of which the purchasers may or may not avail themselves, as they choose.

3. **Brokers ⬤➝61(4)—Principal must disclose to broker foreign laws restricting sale of ship.**

Where a domestic corporation, acting for a foreign corporation, authorized a citizen to procure a purchaser for a ship, the broker, even if it be assumed that he had knowledge that the ship and its owner were foreign, is not chargeable with knowledge of the foreign law restricting the sale, but the principal should have informed the broker of such restriction.

4. **Brokers ⬤➝61(4)—Principal must disclose to ship broker contract restricting right of sale.**

A shipowner must disclose to a broker a bunker agreement between it and a foreign government, which restricted its right to sell its ship, to avoid liability for payment of commission, when the broker procured a customer ready, willing, and able to buy, but to whom the owner could not sell under the agreement

5. **Brokers ⬤➝54—Whether broker's customer is legally able depends on local law.**

If a ship broker is impliedly bound to produce as purchasers of the ship persons under no legal disability, which precluded them from entering into a binding contract for purchase, the question whether such purchaser was produced depends on the law of the place where the contract was entered into.

6. **Contracts ⬤➝101(1), 144, 276—Ordinarily validity and construction governed by law where made; performance governed by law of place of performance.**

Though the parties to a contract, which by its terms is to be performed in a place other than that in which it is made, are presumed to adopt the law of the place of performance as the law of the contract, the general rule as to contracts is that they are governed as to their validity, as well as to their nature and interpretation, by the law of the place where they are made, unless the contracting parties clearly appear to have had some other law in view.

7. **Brokers ⬤➝54—Must procure purchaser ready, willing, and able to buy.**

A broker employed to find a purchaser is not entitled to a commission, where no sale is made, unless he has at least produced a purchaser who is able, ready, and willing to take the property on the terms specified; all three of those elements being necessary.

8. **Brokers ⬤➝54—Ability of customer determined by local law.**

Where the contract is one not to be performed elsewhere, the customer produced by a broker should be, by the law of the place of the contract, legally able to enter into the contract.

9. **Brokers ⬤➝54—Contract with customer procured precludes principal questioning ability of customer to perform.**

Where the principal has entered into a contract for the sale of the property with a customer procured by his broker, he thereby accepts the customer as one able to perform the contract, and cannot thereafter question his ability.

10. **Brokers ⬤➝58—Illegality of contract for services defeats right to commission.**

A broker is not entitled to his commission, if the transaction negotiated by him is illegal, and he participates in the illegality, or has knowledge thereof, or if his services are tainted with illegality.

11. **Brokers ⬤➝63(1)—Not to be deprived of commission because buyer could not obtain registry of vessel sold, and principal alone refused for undisclosed reasons.**

Where a ship broker procured buyers for a ship, who were accepted by the owners, and with whom a valid contract was made, he is not to

be deprived of his commission because the buyers could not obtain registry of the vessel under their government, and the principal alone refused to consummate the transaction for reasons personal to himself, not disclosed to the broker.

Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action by Philip A. Warner against Gaston, Williams & Wigmore of Canada, Limited. Judgment for plaintiff, and defendant brings error. Affirmed.

The plaintiff in error was defendant below, and will be referred to hereinafter as defendant. The defendant in error was plaintiff below, and will be referred to hereinafter as plaintiff. The plaintiff is a citizen of the state of New York, residing in the Southern District thereof. The defendant is a corporation organized under the laws of the Dominion of Canada, and having an office for the transaction of business in the Southern district of New York. The case is stated in the opinion.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Cletus Keating and L. De Grove Potter, both of New York City, of counsel), for plaintiff in error.

Joseph P. Nolan, of New York City, for defendant in error.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. The plaintiff was in the ship broker's business, and he has brought this action to recover the sum of $11,-675, which he alleges to be due to him as a commission for finding a purchaser for the British screw steamship Eskasoni, of St. Johns, Newfoundland, at the price of $475,000. The case has been in this court before. 261 Fed. 993. At that time the right of the plaintiff to recover was sustained, and judgment for defendant was reversed. A new trial has been had, and a judgment has been entered for the plaintiff. The case now presented differs in material respects from the case when it came here before.

It is alleged that on December 11 and 12, 1918, the defendant was the owner of the steamship, and that it agreed with the plaintiff, that if he should succeed in finding a purchaser for the boat at the price of $475,000, the defendant would pay to the plaintiff the sum of 2½ per cent. upon such purchase price for his services in the matter. It is further alleged that thereafter the plaintiff procured Philip Templeman and George A. Moulton, as purchasers of the steamship, who thereupon began negotiations for the same, and who thereafter entered into a contract of purchase and charter for the steamship with the defendant for the purchase price of $475,000. It is claimed that the sale was effected through the efforts of the plaintiff. Nothing has been paid to the plaintiff, except the sum of $125, which was paid to him on March 15, 1917. The plaintiff has obtained a verdict for $11,-750. with interest from March 12, 1917.

It is admitted that the defendant at the time alleged was the owner of the vessel, and that it entered into the agreement with the plaintiff that he alleges. It is also admitted that the plaintiff procured Philip Templeman and George A. Moulton as purchasers of the vessel, and that they thereafter entered into an attempted contract with the defendant for the purchase and charter of the steamship at the price of $475,000, and that they paid down $5,000 on the execution of the alleged contract, and that the defendant paid 2½ per cent. of that amount to the plaintiff as a commission thereon. But it appears that the purchase was not consummated, and it is claimed that neither the vendor nor the vendees were capable, under British law, of consummating it. The defendant, the owner of the vessel, and Templeman and Moulton were all of them subjects of the kingdom of Great Britain and Ireland and residents of the crown colony of Newfoundland. They were British subjects, and as such were subject to the laws and commands and orders of the British government.

At the time of the alleged contract of purchase the defendant was bound by a contract which it had with the British government, wherein it agreed to comply with certain instructions and rules of the British government in the operation of its vessels, and agreed that it would not charter any vessel to any one to whom the British government objected. There was put in evidence at the trial so much of the British Defense of the Realm Regulations as is quoted below. Those regulations, it is admitted, were in force at the time the alleged contract for the purchase and sale of the vessel was entered into between the defendant and Templeman and Moulton. Section 39CC of the above regulations reads as follows:

"A person shall not, without permission in writing from the Shipping Comptroller directly or indirectly and whether on his own behalf or on behalf of or in conjunction with any other person, purchase or enter into or offer to enter into any agreement or any negotiations with a view to an agreement for the purchase of any ship or vessel.

"If any person acts in contravention of this regulation, or if when any permission of the Shipping Comptroller has been granted under this regulation, subject to any conditions and the person to whom it was granted fails to comply with any such condition, he shall be guilty of an offense against these regulations."

It is argued that this regulation was obligatory upon the defendant and upon Templeman and Moulton, being British subjects and as the ship was a British ship. Consent to the sale was never obtained from the British Shipping Comptroller under section 39CC. When the defendant approached the British authorities at New York on the subject, it was notified by the British consul that the British government would withhold its consent. Thereupon the defendant refused to consummate the sale and paid back to Templeman and Moulton the $5,000 paid by them to bind the contract.

At the trial a British barrister was permitted to testify as an expert in British law. He stated that the contract of sale which the defendant had made with Templeman and Moulton was void under British law. But in the opinion of the majority of this court, and for rea-

sons which will appear later, it is not material whether the contract of sale was void under British law or not.

The court below declined to charge the jury, as requested by the defendant, that "if they believed the evidence to the effect that the contract under British law was illegal and void, that that would constitute a good defense to this action." This refusal was excepted to at the time, and has been assigned for error. It is also assigned for error that the court instructed the jury that the existence of British law was no defense to the action, and in directing them to bring in a verdict for the plaintiff for the full amount claimed.

[1] The law has long been firmly established that the lex loci rei sitæ determines the validity of a contract for the sale of real property. It has been many times said that personal property has no locality, but follows the person of the owner, "mobilia sequuntur personam," and that the validity of its transfer must be determined according to the laws of the owner's domicil. The proposition, however, has also been denied. In Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18, 22, 11 Sup. Ct. 876, 878 (35 L. Ed. 613), it was said:

"The old rule, expressed in the maxim 'mobilia sequuntur personam,' by which personal property was regarded as subject to the law of the owner's domicile, grew up in the Middle Ages, when movable property consisted chiefly of gold and jewels, which could be easily carried by the owner from place to place, or secreted in spots known only to himself. In modern times, since the great increase in amount and variety of personal property, not immediately connected with the person of the owner, that rule has yielded more and more to the lex situs, the law of the place where the property is kept and used."

And in Bulkley v. Honold, 19 How. 390, 15 L. Ed. 663, the court held that the sale of a ship, which was effected at New Orleans, the vendor having his domicile in New York, was governed by the laws of Louisiana, where the contract was made and performed, and not by the laws of New York. In that case both parties apparently had their domicile in the United States. In the case now before us the vendor and the vendee had a British domicile. That fact alone is not of controlling importance, so far as the question now before this court is concerned.

[2] As between the parties, the sale and delivery of a vessel passes the title at common law. The question of registration is another and distinct matter. The registration of a vessel is not compulsory, but a privilege and advantage, of which the purchasers may or may not avail themselves as they choose. In the argument in this court in the instant case, the question of whether the validity of the contract for the sale of the ship depended upon the lex loci contractus, the lex loci celebrationis, or whether it depended upon the law of. the domicile, was not mooted.

The complaint alleges that defendant agreed with plaintiff that, if plaintiff should succeed in finding a purchaser for the steamship Eskasoni at the price of $475,000, the defendant would pay to plaintiff the sum of 2½ per cent. upon such purchase price for its services. Then the complaint goes on to allege that the plaintiff thereafter procured Philip Templeman and George A. Moulton as purchasers of the vessel, and that they entered into a contract of purchase with de-

fendant for the purchase price of $475,000. The truth of these allegations defendant expressly admitted in its answer.

While the action is brought against Gaston, Williams & Wigmore of Canada, Limited, plaintiff was employed directly, not by that corporation, which existed under the laws of the Dominion of Canada, but by another corporation, known as Gaston, Williams & Wigmore Steamship Corporation, which the record disclosed to be an "American corporation," and which managed the affairs of the Canadian corporation. The evidence of the employment is in the following letter:

"The Globe Line,

"Gaston, Williams & Wigmore Steamship Corporation,

"Office of Vice President & General Manager, 120 Broadway, New York.

"[Flag]                                                    December 11th, 1916.

"J. B. Austin, Jr., Vice Pres. & Gen. Mgr.

"Mr. P. A. Warner, 30 Church Street, New York City—Dear Sir: Referring to our conversation this afternoon, I beg to advise that you are authorized to offer the steamer Eskasoni for sale for four hundred and seventy-five thousand dollars, $475,000.00. Details as to terms of payment, transfer of steamer, etc., can be talked over when you have purchasers.

"Yours very truly,          ·          J. B. Austin, Jr., Vice Pres. & Gen. Mgr."

[3] The Mr. Austin who signs the letter and who arranged the employment of the plaintiff testified that he is a citizen of the United States. The letter does not disclose that the steamer did not belong to the American corporation, or that she had a British registry, or that the proposed purchasers of the ship would have to be approved by the British authorities, or that the American corporation was acting for, or on behalf of, the Canadian corporation which owned the ship. The record does not disclose that the plaintiff's attention was called in any way to these facts at the time he was employed, or that he knew anything about them until after the contract of sale had been signed by the defendant and by the purchasers brought into the transaction by the broker. We do not know any rule of law which enables this court to go outside the record, and infer that the plaintiff must have known that the ship he was employed to sell was a British ship. But we shall, for the sake of the argument, assume, what no doubt was true in fact, that the plaintiff knew all the time that the ship was British and that the seller and purchasers were British. We know of no rule of law, however, which imposed upon the plaintiff under such circumstances the duty of acquainting himself with the British law, and any rules and regulations which the British government has established concerning the transfer of British ships during the war. What a broker undertakes is merely to produce a person able, ready, and willing to purchase on the terms prescribed by his principal. If there are other conditions to be complied with, it is the duty of the principal to acquaint the broker with them. The principal is not relieved from the duty of disclosure by the fact that the conditions happen to grow out of the peculiarities of the foreign law. It is the foreign principal, and not his American broker, who is assumed to know what the foreign law is.

[4] It appears, too, that the defendant had entered into a bunker coal agreement with the British government, by which it agreed to comply with certain instructions and rules of the government in the operation of its vessels, and agreed that it would never charter any vessel to any one to whom the British government objected. The answer to the complaint alleges, referring to the above agreement, that "this fact was or should have been known by the plaintiff." It could not have been known to him, however, unless Gaston, Williams & Wigmore, or the defendant, or the British authorities disclosed it. The evidence does not show that the information was communicated to the plaintiff, and the plaintiff himself testified that he had "no knowledge of the bunker agreement," by which we understand him to mean that he had no knowledge of it until after the contract of sale was executed by the vendor and vendees. If a principal enters into an agreement which restricts his right to sell, it is his duty to disclose it to his broker; and if he makes no such disclosure, and the broker has no knowledge of it, the broker certainly cannot be deprived of his commission because the principal fails to complete the sale on that account.

The fact of the matter is that it never occurred to the principal, at the time he employed his broker, the plaintiff, nor, for that matter, until after the contract of sale was signed by it and the purchasers, that there might be an obstacle to the final consummation of the sale by the refusal of the British authorities to approve it. The fault was that of the seller, and not that of the broker. The broker performed all that he was required to do by the terms of his employment, and the seller cannot be heard now to defeat his right to his commission by setting up its own failure to make the disclosure as a bar to his recovery.

The broker produced two purchasers, and one only was objected to, and the one who was objected to assigned all his interest in the contract of sale to the other, who was able, ready, and willing to perform. Notwithstanding the assignment, the vendor refused to proceed with the sale under the contract which it has executed. With its reasons for doing so we are not now concerned. Mr. Austin, the general manager of Gaston, Williams & Wigmore, testified that at that time the price of vessels was rising, and that his concern was getting offers for the ship "right along." In reference to one of the offers he was questioned and answered as follows:

"Q. Was it as high as $575,000? A. I can tell from my papers; somewhere around that."

It does not appear whether or not that fact influenced the defendant's conduct.

[5, 6] It may be proper for us to say more explicitly, although it might be inferred from what has been already stated, that if it be assumed that the broker was impliedly bound under his contract of employment to produce as purchasers of the ship persons under no legal disability which precluded them from entering into a binding contract of sale that the question as to whether such persons were pro-

duced depends upon the lex loci contractus, using the phrase as denoting the place where the contract was entered into. It may be conceded that, where a contract is by its term to be performed in a place other than that in which it is made, the parties, according to the trend of American authorities, are presumed to adopt the law of the place of performance as the law of the contract. Hall v. Cordell, 142 U. S. 116, 12 Sup. Ct. 154, 35 L. Ed. 956. The general rule as to contracts, however, is that they are to be governed as to their validity, as well as to their nature and interpretation, by the law of the place where they are made, unless the contracting parties clearly appear to have had some other law in view; and under the express terms of the executed contract of sale between the vendor and the vendees the ship was to be delivered at New York. It certainly cannot be said that it was made known to the broker at the time of his employment that any other law than the law of the place of contract was in any way applicable to the transaction in which the parties were engaged. By the lex loci contractus the vendees were not subject to any legal disability, and were able, ready, and willing to consummate the transaction.

[7] It is elementary that a broker employed to find a purchaser is not entitled to a commission, where no sale is made, unless he has at least produced one who is able, ready, and willing to take the property on the terms specified. Ferguson v. Willard, 196 Fed. 370, 116 C. C. A. 406; Wittwer v. Hurwitz, 216 N. Y. 259, 110 N. E. 433; Wheeler v. Lawler, 222 Mass. 210, 110 N. E. 273; Abbott v. Lee, 86 Conn. 392, 85 Atl. 526. Each of the words "able, ready, and willing" expresses an idea that the others do not convey. Phillips' Ex'r v. Rudy, 146 Ky. 780, 784, 143 S. W. 397. And all three of these elements must be found in the purchaser who is produced, to entitle the broker to his commissions. Bronk v. Connecticut Trust, etc., Co., 89 Conn. 134, 93 Atl. 128; Riley v. Hoffman, 216 Mass. 352, 103 N. E. 904; Von Bayer v. Ninigret Mills Co., 164 App. Div. 698, 150 N. Y. Supp. 291; McDermott v. Mahoney, 139 Iowa, 292, 115 N. W. 32, 116 N. W. 788.

The general rule appears to be that the broker is entitled to his commission when his efforts have resulted in a sale, or in procuring a customer who is able, ready, and willing to buy upon the terms prescribed by the owner. If the customer is produced who is able, ready, and willing to buy, the fact that the sale fails through no fault of the broker and no fault of the customer cannot deprive the broker of his commission. Home Banking & Realty Co. v. Baum, 85 Conn. 383, 386, 82 Atl. 970; Smith v. Peyrot, 201 N. Y. 210, 214, 94 N. E. 662.

[8] Where a contract is one not to be performed elsewhere, the customer produced should be by the lex loci contractus legally able to enter into the contract. In Volker v. Fisk, 75 N. J. Eq. 497, 72 Atl. 1011, the owner of certain real estate agreed with a broker to sell the same for $5,700, or any greater sum, and said that she could retain for her own use all purchase money in excess of that sum. The broker procured one to purchase the premises for $6,000. Later the purchaser, who was an infant at the time the property was purchased, repudiated the purchase and recovered back the purchase price. The court held that the broker never earned the commission, as it was paid on a

sale which was afterwards avoided, and that the commission which had been paid could not be retained by the broker. The Vice Chancellor said:

"An invalid sale is practically no sale, * · * * and she [the broker] cannot retain an advantage resulting from her unavailing effort."

In Fox v. Ryan, 240 Ill. 391, 397, 88 N. E. 974, the court declares that when a broker produces a buyer, and the seller accepts him and executes an enforceable contract of sale, it is held to be a determination by him of the purchaser's ability to perform his contract, and the seller cannot defeat the broker's commissions on the ground that the purchaser is not able to buy the property. And see Wilson v. Mason, 158 Ill. 304, 311, 42 N. E. 134, 49 Am. St. Rep. 162. And in Mitchell v. Weddington (decided by the Kentucky Court of Appeals) 122 S. W. 802 (1909),[1] the broker was employed to purchase the coal and minerals on a certain farm. He obtained from the owners of the farm a contract, signed by each of the six owners, in which they declared that they had sold to the defendant all the coal and minerals in, on, and under their lands at the agreed price. It appeared that one of the owners who signed the contract was a minor. The defendant, the vendee, refused to complete the purchase. The broker brought suit against him for his commissions. The court below instructed the jury to find for defendant. The Court of Appeals affirmed the judgment, saying:

"The cases cited by appellant are not applicable to the facts of this case. In those cases the brokers had done all that they contracted to do. Here the appellant did not do all that he contracted to do, because he failed to purchase the land by a contract that was binding on all the parties signing it."

The general rule in England and the United States rejects the continental rule, and holds that the capacity of a party to contract is determined by the law of the place where the contract is made. In the above case by the lex loci contractus the contract was not binding, because of the infant's right to disaffirm.

In Goodnough v. Kinney, 205 Mass. 203, 91 N. E. 295, it is said:

"It is settled that, where the broker secures a customer who is both willing and financially able to purchase property upon the terms authorized by the principal, who has been informed of the completion of the negotiations, a commission has been earned, even if a sale is not completed because the parties never enter into a binding agreement, or the owner refuses or neglects to make a conveyance."

[9] In Kalley v. Baker, 132 N. Y. 1, 29 N. E. 1091, 28 Am. St. Rep. 542, a broker was employed by the defendant to effect a sale of his farm. The broker produced a customer, and negotiations began which resulted in an agreement for an exchange of the farm for an apartment house owned by the customer the broker produced. The written contract provided that the two properties were to be free from all incumbrances, except the apartment house was to be subject to two mortgages. When it came to the exchange of deeds, the person who employed the broker found objections to the title offered by the cus-

---

[1] The case is not in the Kentucky Reports.

tomer. A considerable sum of interest on the mortgages was unpaid, as well as a large amount of unpaid taxes, and the customer was a married woman, and her husband had not joined in the deed. There were other objections, and the title was rejected, and the contract of exchange was never performed. The court held that the broker was entitled to his commissions when the contract of exchange was executed. The court below instructed the jury:

"That, in the absence of any express agreement to the contrary, the law is that the broker is entitled to his commissions when the vendor accepts, when he [the broker] brings to the vendor a party ready and willing to accept the terms fixed by the vendor, and the party is satisfactory to the vendor and he enters into a contract with him."

The Court of Appeals held that the instruction presented no error.

In Colvin v. Post Mortgage & Land Co., 225 N. Y. 510, 516, 122 N. E. 454, it is laid down that to earn his commissions a broker ordinarily must accomplish what he undertakes to do in his contract of employment; that if he fails to do so, but produces a buyer with whom the owner is satisfied, and who executes a contract of sale with the owner at a price and upon terms satisfactory to the latter, the broker is entitled to his compensation. The court then goes on to say that a failure to complete thereafter, whether due to the fault of the buyer or of the seller, will not deprive the broker of his commissions. This seems to be the law of the state of New York, which is the place in which the broker was employed and where the services were rendered; and in the instant case the broker produced customers who were able, ready, and willing to contract, and were accepted by the seller, who executed a contract of sale with them.

[10] That the broker may lose his right to his commission because of the illegality of the transaction is, of course, true. The rule is that, if the transaction negotiated by the broker is illegal, and he participates in the illegality or has knowledge thereof, he is not entitled to his commission. Neither is he entitled to it if his services are tainted with illegality. 9 C. J. 634; 19 Cyc. 375; Irwin v. Williar, 110 U. S. 499, 510, 4 Sup. Ct. 160, 28 L. Ed. 225; Volker v. Fisk, supra; Walsh v. Hastings, 20 Colo. 243, 38 Pac. 324; Kahn v. Walton, 46 Ohio St. 195, 20 N. E. 203. But in this case the contract of sale was not illegal under the law of the state of New York, where it was made and was to be performed.

The Supreme Court has held that, if the party employing a broker makes representations to the latter who obtains a customer able, willing, and ready to buy, the vendor is bound for the commission, if the sale fails solely because the vendee finds that the representations made by the vendor to the broker and repeated by him to the vendee were false. In Dotson v. Milliken, 209 U. S. 237, 28 Sup. Ct. 489, 52 L. Ed. 768, the owner of 124,000 acres of coal land agreed with a broker to give him $2.50 an acre for every acre the broker could sell at $20, and that the broker was to go to work for a purchaser. The owner made certain representations to the broker as to the intentions of a railroad company to run its road through the property. The broker secured a purchaser on the terms named by the vendor, but

when it came to consummating the deal the purchaser declined to take the property, because he learned that the representations as to what the railroads would do were not true. The broker sued for his commission, and obtained a judgment in his favor, which the Supreme Court affirmed. The court, in a unanimous opinion written by Mr. Justice Holmes, said:

"We must repeat that it does not matter how much or how little the purchaser relied upon the defendant's representations, if the plaintiff relied upon them and obtained a purchaser ready and able to purchase upon the basis that the defendant's representations to the plaintiff were true."

In the above case the thing contemplated was a sale, and no sale resulted; but the broker got his commission. In principle we are unable to distinguish such a case as the above from one in which the vendor withholds from the broker essential conditions as that the buyer must be approved by a foreign government, and the buyer produced is able, willing, and ready to perform, but the sale fails solely because of some condition undisclosed to the broker.

[11] To recapitulate in brief, the broker in this case produced purchasers able, ready, and willing to buy, and not disqualified from doing so by the lex loci contractus. They were accepted by the defendant, who signed with them a valid contract of sale. While the purchasers were British subjects, and could not obtain British registry for the ship, that fact would not invalidate the sale, nor prevent title from passing, and they were willing to take the title at their own risk, with full knowledge of all the facts. The principal alone refused to consummate the transaction, for reasons personal to himself and not disclosed to the plaintiff. The failure to complete was not the fault of the plaintiff, who is entitled to recover his commissions.

Judgment affirmed.

HOUGH, Circuit Judge (dissenting). This broker produced purchasers, who were ready, willing, and able enough to do everything needful, except satisfy British law in the sale of a British vessel. The arrangement for which this court rewards plaintiff below would have subjected the purchasers to penalties, if not to criminal prosecution, made the ship something that had better be kept hidden from the maritime power of Great Britain, and rendered it practically impossible for vendors to stay in the shipping business. To produce such an imbroglio is not a service, and to call it a sale is a misnomer. What seems to me error arises from totally disregarding the law of the ship's flag.

I dissent.