# IRWIN *v.* WILLIAR & Another.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

Argued October 17th, 18th, 1883.—Decided March 3d, 1884.

*Contract—Partnership—Principal and Agent—Wagers.*

A contract of partnership for the buying of grain, both wheat and corn, and its manufacture into flour and meal, and the sale of such grain as might accumulate in excess of that required for manufacturing, and the use, with the knowledge of all the partners in the partnership business, of cards and letter-heads describing the firm as millers and dealers in grain, do not necessarily imply as matter of law authority to deal in the partnership name in futures by means of contracts of sale or purchase for purposes of speculating upon the course of the market, and to bind the partnership thereby.

Dealing in futures by means of contracts of sale or purchase for purposes of speculating upon the course of the market, is not as matter of law an essential characteristic of every business to which the name of dealing in grain may properly be assigned.

If under guise of a contract to deliver goods at a future day the real intent be to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, the whole transaction is nothing more than a wager, and is null and void.

When a broker is privy to such a wagering contract, and brings the parties together for the very purpose of entering into the illegal agreement, he is *particeps criminis*, and cannot recover for services rendered or losses incurred by himself in forwarding the transaction.

Generally, in this country, wagering contracts are held to be illegal and void as against public policy.

A custom among brokers in the settlement of differences which works a substantial and material change in the principal's rights or obligations is not binding upon the principal without his assent; and that assent can be implied only from knowledge of the custom which it is claimed authorizes it.

The defendants in error were plaintiffs below, and brought this action against the plaintiff in error, as surviving partner of the firm of Irwin & Davis, to recover a balance alleged to be due, growing out of certain sales of wheat for future delivery, claimed to have been made by the defendants in error for the firm of Irwin & Davis upon their order. The liability of the plaintiff in error was denied on two grounds: 1. That the trans-

actions were made by Davis, the deceased partner, without the knowledge, assent or authority of the plaintiff in error, and were not within the scope of the partnership business; and 2. That the sales were wagering contracts and void.

The bill of exceptions showed that there was evidence on the trial tending to prove the following state of fact:

Irwin, the plaintiff in error, and Davis, who died in October, 1877, became partners in 1872 in the ownership and operation of a flouring-mill and appurtenances at Brazil, Clay County, Indiana. Their contract of partnership contemplated the buying of grain—both wheat and corn—and its manufacture into flour and meal, and the sale of such grain as might accumulate in excess of that required for manufacturing; and did not contemplate, as between themselves, the buying and selling of grain in large quantities for speculation. The capacity of the mill did not exceed sixty barrels of flour per day; its average manufacture was thirty. The working capital of the firm varied from $2,000 to $4,000. Irwin resided at Butler, in Pennsylvania, and visited Brazil rarely. Appurtenant to the mill was a warehouse, for the storage of grain, equipped with appliances for loading and unloading grain, in bulk, into and from railroad cars. Soon after the formation of the partnership, and as a part of its business, Davis, in its name, began and continued to ship corn and oats to Indianapolis, and corn and flour to Baltimore, for sale and immediate delivery, in consignments not exceeding $1,000 each in value; and in the year 1875 several such consignments had been made to the defendants in error at Baltimore for sale on account of the firm by Davis. In all their business correspondence, including that with the defendants in error, who were commission merchants and grain brokers in Baltimore, the cards and letter-heads were as follows: "Brazil Flouring Mills, Irwin & Davis, millers and dealers in grain, Brazil, Ind." This letter-head was used with the knowledge of Irwin, who, however, had no knowledge of any transactions by Davis, on account of the firm, in the purchase or sale of grain for future delivery. Prior to 1877, in point of fact, Davis had given no orders for the purchase of grain in Baltimore, or any Eastern market, and during that year, in the

months of July, August and September, he shipped to defendants in error thirty-one car loads of wheat, of about three hundred and eighty bushels each, for sale, which was accounted for.

The transactions which form the subject of this suit were as follows: On July 12th, 1877, Davis, by cipher telegrams and letters, gave an order to defendants in error to sell 20,000 bushels of wheat for delivery in August, and followed that up with similar orders until the last, on September 3d, a period of fifty-three days, making an aggregate of 30,000 bushels for delivery in August, 105,000 bushels in September, and 30,000 bushels in October, in all 165,000 bushels. These orders were reported by the defendants in error as executed at the prices named, amounting in gross to $251,794.84. At or before maturity these contracts of sale were settled by defendants in error on account of Davis and Irwin according to the custom of the Corn and Flour Exchange in Baltimore, of which the former were members, at and through the members of which substantially all the business of buying and selling grain at that city was done. In these settlements the differences between the prices at which the wheat had been sold and those which the brokers would have been compelled to pay, or did pay, as the market prices, at the time of settlement, for wheat to deliver or in fact delivered in execution of the sales, amounted to $17,217.95, which was the balance sued for and recovered in this action. Davis did not consign or deliver to defendants in error any of the wheat so contracted to be sold on their account, although he had during the same period consigned other wheat to defendants in error, as above stated, but which, pursuant to orders given at the time, had been sold on arrival, but not applied on contracts of sale for future delivery. The defendants in error actually delivered on account of Davis and Irwin about 40,000 bushels of wheat on their contracts, which they purchased in open market for that purpose, but as to the rest, settled by paying the differences between the contract and market prices.

There was evidence tending to show that among the general usages and customs obtaining at Baltimore among grain commission merchants were the following, which were well known

and which had long existed and been uniformly observed among the members of, said Corn and Flour Exchange and others engaged in the buying and selling of grain on commission at said city, viz.:

1st. That a commission merchant buying or selling grain upon the order of a customer for future delivery entered into such contract in his own name, thereby becoming personally responsible to the party with whom he contracted for the performance of the contract, the name of his principal being never, or but rarely, disclosed.

2d. That such commission merchant held himself and stood responsible to his principal or customer for the performance by the other party with whom he entered into such contract of purchase or sale of such contract, and for making good the contract to nis principal in case of the insolvency or default from any cause of such other party.

3d. That purchases or sales to fill orders of customers are usually made on the floor of the Corn and Flour Exchange, by open public offer to the members of the board there assembled. That when it so occurs as that a commission merchant, who upon the order of one customer has sold to (or *vice versa* purchased from) another commission merchant grain for a certain future delivery, and afterwards, upon the order of another customer, buys (or *vice versa* sells) a like amount of like grain for the same future delivery, from (or to) the same commission merchant, the two commission merchants as between themselves set off one contract against the other and mutually surrender or cancel them, settling between them the difference in price, each substituting on his books in the place and stead of the other the new or second customer, upon whose order he made the second purchase or sale. Thus if commission merchant A, upon the order of his customer X, has sold grain for a designated future delivery to commission merchant B, and afterwards upon the order of customer Y, buys like grain for like delivery from B, A and B adjust the difference, cancel their contracts, and surrender any margins that may have been put up by them, and in such case A substitutes his second customer Y in place of B, so that the grain he had sold on the

order of X would be delivered to Y instead of to B; A standing as guarantor to Y that X will deliver the grain, and to X that Y will receive and pay for it, and that X shall receive the full price at which the grain had been contracted to B.

4th. That where such second transaction is not with the same commission merchant with whom the first had occurred, but a different one, and it is found that a circuit of like contracts exists, by which commission merchant A has sold grain to merchant B, who has sold like grain to C, who has made like sale to A, the commission merchants settle as among themselves by what is called a "ring." The parties in such case do not make successive deliveries until the grain comes round again to the commission merchant from whom it started, nor does each buyer pay the full amount of his purchase money to his immediate seller, but receives or pays, as the case may be, the amount of the net profit he would have received or of net loss he would have sustained if the settlement had not been made by a "ring."

In such case all margins put up by the commission merchants are restored, the contracts surrendered, and the contracts or orders of their undisclosed principals, upon whose instructions they had entered into those contracts, are held in lieu of the contracts so surrendered, each commission merchant being responsible to each of his customers for performance by the other.

The settlements of differences, made by defendants in error on account of Davis and Irwin, were made in pursuance of these customs, but there was no evidence that Davis and Irwin had any actual knowledge of them.

There was evidence also tending to prove that Irwin had no knowledge of the transactions between Davis and the defendants in error until after they had been completed.

On the trial it was claimed on behalf of the defendant below that the transactions in question were not authorized by the partnership agreement, that they were not in the regular course of the partnership business, and were not within its apparent scope.

On that point, among other things, the Circuit Court charged the jury as follows:

"4. If Irwin permitted Davis to hold himself and Irwin out to the world as partners in the business of dealing in .grain, he became liable with Davis on contracts for the sale and purchase of grain for future delivery, and in that case it is not material that Irwin should have actual knowledge of particular sales or purchases in the firm name ; and if Irwin knew that Davis was holding the firm out as dealers in grain, and did not protest or. give public notice to the contrary, he is responsible as partner for all contracts made by Davis in the firm name, within the apparent scope of the business of dealing in grain. If Davis, as partner, did in fact buy and sell grain, and if in his correspondence with customers and others, including the plaintiffs, he employed printed letter-heads or cards representing the firm of Irwin & Davis as grain dealers, this was a holding out of that firm as a partnership engaged in that business, and if before and at the time of the dealings with the plaintiffs, Irwin knew that the firm was thus .held out as grain dealers, he is liable as a partner. If, therefore, you believe from the evidence that Irwin & Davis held themselves out as dealers in. grain as well as in. flour, and that plaintiffs dealt with Davis, supposing they were dealing with the firm, and in so doing advanced their own money in fulfilling such contracts, you should find for the plaintiffs in whatever sum the evidence may show them to be entitled to on account of such advancements, unless you think the defendant has shown that the transactions between the plaintiffs and Irwin & Davis were gambling transactions."

This was excepted to, and was assigned for error.

*Mr. John M. Butler* for plaintiff in error.

*Mr. J. A. Hendricks* and *Mr. C. Baker* for defendants in error.

MR. JUSTICE MATTHEWS delivered the opinion of the court. After reciting the facts in the foregoing language, he continued :

The proposition contained in this charge is that the business of dealing in grain, no matter how much it may be restricted by agreement between the partners, and no matter how it may have been qualified by the actual practice of the firm, necessa.

rily authorizes each partner to bind the others by unknown contracts in distant markets for unlimited sales and purchases of grain for future delivery. And so the jury must have understood it; for they were told that "if Irwin permitted Davis to hold himself and Irwin out to the world as partners in the business of dealing in grain, he became liable with Davis on contracts for the sale and purchase of grain for future delivery, and in that case it is not material that Irwin should have actual knowledge of particular sales or purchases in the firm name;" and "if Davis, as partner, did in fact buy and sell grain, and if, in his correspondence with customers and others, including the plaintiffs, he employed printed letter-heads or cards representing the firm of Irwin & Davis as grain dealers, this was a holding out of that firm as a partnership engaged in that business;" and "if, therefore, you believe from the evidence that Irwin & Davis held themselves out as dealers in grain as well as in flour, and that the plaintiffs dealt with Davis, supposing they were dealing with the firm, &c., you should find for the plaintiffs," &c. This was equivalent to directing the jury to find a verdict for the plaintiffs in the action, for the only facts to which their attention was directed as material were not disputed, viz., that the firm had been in the habit of buying and selling grain, and had constantly used letter-heads describing themselves as dealers in grain.

In this, we think, there was error. The liability of one partner, for acts and contracts done and made by his copartners, without his actual knowledge or assent, is a question of agency. If the authority is denied by the actual agreement between the partners, with notice to the party who claims under it, there is no partnership obligation. If the contract of partnership is silent, or the party with whom the dealing has taken place has no notice of its limitations, the authority for each transaction may be implied from the nature of the business according to the usual and ordinary course in which it is carried on by those engaged in it in the locality which is its seat, or as reasonably necessary or fit for its successful prosecution. If it cannot be found in that, it may still be inferred from the actual though exceptional course and conduct of the business of the partner-

ship itself, as personally carried on with the knowledge, actual or presumed, of the partner sought to be charged.

In the present case the partnership agreement cannot affect the question, because it is not claimed on the one·hand that it conferred actual authority to make the transactions in dispute, nor, on the other, that the defendants in error had any notice of its limitations.

And so, too, any implication that might have arisen from a previous course of business of this character, carried on by Davis with the knowledge of Irwin, must be rejected, for it is not claimed that any foundation in proof existed for it.

The only remaining ground for the implied authority by which it can be claimed that Irwin was bound by the contracts of his partner is that arising from the intrinsic nature of the business in which the partnership was actually engaged, or from the usual and ordinary course of conducting it at the locality where it was carried on.

What the nature of that business in each case is, what is necessary and proper to its successful prosecution, what is involved in the usual and ordinary course of its management by those engaged in it, at the place and time where it is carried on, are all questions of fact to be decided by the jury, from a consideration of all the circumstances which, singly or in combination, affect its character or determine its peculiarities, and from them all, giving to each its due weight, it is its province to ascertain and say whether the transaction in question is one which those dealing with the firm· had reason to believe was authorized by all its members. The difficulty and duty of drawing the inference suitable to each case from all its circumstances cannot be avoided or supplied by affixing or ascribing to the business some general name, and deducing from that, as a matter of law, the rights of the public and the duties of the partners. Dealing in grain is not a technical phrase from which a court can properly infer as matter of law authority to bind the firm in every case irrespective of its circumstances; and if, by usage, it has acquired a fixed and definite r·  ning, as a word of art in trade, that is matter of fact to be established by proof and found by a jury. It may mean one thing

at Brazil in Indiana, another at Baltimore. It may not be the same when standing alone with what it is in connection with a flouring-mill in a small interior town. It may mean dealing in grain on hand for present delivery for cash or on credit, or it may mean, also, dealing in futures by means of contracts of sale or purchase for purposes of speculating upon the course of the market. We are quite clear that the latter feature of the business, as it may sometimes be prosecuted, is not as matter of law an essential characteristic of every business to which the name of dealing in grain may be properly assigned. And yet this is distinctly what in the present case was given to the jury as the law, and in that respect the Circuit Court erred.

As the judgment now under review would have to be reversed for the error just pointed out, it is not necessary for the purpose of disposing of the present writ of error to proceed further to examine other assignments; but as the case must be remanded for a new trial, in which the remaining questions may again arise, it seems appropriate now to dispose also of them.

It was contended on the part of the defendant below, that the transactions on which the suit was founded were void as wagering transactions.

On this point, the court charged the jury as follows:

"5. If you find that the dealings with the plaintiffs were within the scope of the partnership, you will next consider whether the dealings were gambling transactions. The burden of showing that the parties were carrying on a wagering business, and were not engaged in legitimate trade or speculation, rests upon the defendant. On their face these transactions are legal, and the law does not, in the absence of proof, presume that parties are gambling.

"A person may make a contract for the sale of personal property for future delivery which he has not got. Merchants and traders often do this. A contract for the sale of personal property which the vendor does not own or possess, but expects to obtain by purchase or otherwise, is binding if an actual transfer of property is contemplated. A transaction which on its face

is legitimate cannot be held void as a wagering contract by show-ing that one party only so understood and meant it to be.

"The proof must go further, and show that this understanding was mutual—that both parties so understood the transaction. If, however, at the time of entering into a contract for a sale of per-sonal property for future delivery it be contemplated by both par-ties that at the time fixed for delivery the purchaser shall merely receive or pay the difference between the contract and the mar-ket price, the transaction is a wager, and nothing more. It makes no difference that a bet or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade.

"6. It is not sufficient for the defendant to prove that Irwin & Davis never understood that they were to deliver wheat in fulfilment of the sales made for them by the plaintiffs. The presumption is, that the plaintiffs expected Irwin & Davis to execute their contracts, expected them to deliver the amount of grain sold, and before you can find that the sales were gambling transactions and void, you must find from the proof that the plaintiffs knew or had reason to believe that Irwin & Davis contemplated nothing but a wagering transaction, and acted for them accordingly. If the plaintiffs made sales of wheat for Irwin & Davis for future delivery, understanding that these contracts would be filled by the delivery of grain at the time agreed upon, Irwin & Davis were liable to the plaintiffs, even though they meant to gamble, and nothing more."

No objection seems to be made to this charge, so far as it defines what constitutes a wagering contract, and we accept it as a correct statement of the law upon that point.

The generally accepted doctrine in this country is, as stated by Mr. Benjamin, that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them; but such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller and the price to be paid by the buyer; and, if under guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not

to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is null and void. And this is now the law in England by force of the statute of 8 & 9 Vict. c. 109, s. 18, altering the common law in that respect. Benjamin on Sales, §§ 541, 542, and notes to 4th Am. Ed. by Bennett.

In *Reed* v. *Anderson*, 48 L. T. N. S. 74, the defendant was nevertheless adjudged liable to refund to the plaintiff the amount lost by the latter by a bet on a horse race, made in his own name, but for the defendant, at his request; and this was followed in *Thacker* v. *Hardy*, 4 Q. B. D. 685. There the plaintiff was employed by the defendant as a broker to speculate for him on the Stock Exchange. It was never intended between the parties that the defendant should take up the contracts into which the plaintiff entered on his behalf, but the plaintiff was to arrange matters so that nothing but "differences" should be actually payable to or by the defendant. The plaintiff having entered into such contracts on the defendant's behalf, in respect of which he became, by the rules of the Stock Exchange, personally liable, he sued the defendant for his commissions and for indemnity against the liability he had incurred. It was held that the agreement between the plaintiff and defendant was not a gaming contract, within the meaning of the statute. The case was distinguished from *Grizewood* v. *Blane*, 11 C. B. 526, which was an action on a contract for the future delivery of railway shares, in which Jervis, C. J., left it to the jury to say "what was the plaintiff's intention and what was the defendant's intention at the time of making the contracts, whether either party really meant to purchase or to sell the shares in question, telling them that if they did not, the contract was, in his opinion, a gambling transaction and void." This ruling was held to be correct. In *Rountree* v. *Smith*, 108 U. S. 269, it was said that brokers who had negotiated such contracts, suing not on the contracts themselves, but for services performed and money advanced for defendant at his request, though they might under some circumstances be so connected

with the immorality of the contract as to be affected by it, they are not in the same position as a party sued for the enforcement of the original agreement. It is certainly true that a broker might negotiate such a contract without being privy to the illegal intent of the principal parties to it which renders it void, and in such a case, being innocent of any violation of law, and not suing to enforce an unlawful contract, has a meritorious ground for the recovery of compensation for services and advances. But we are also of the opinion that when the broker is privy to the unlawful design of the parties, and brings them together for the very purpose of entering into an illegal agreement, he is *particeps criminis*, and cannot recover for services rendered or losses incurred by himself on behalf of either in forwarding the transaction.

In England, it is held that the contracts, although wagers, were not void at common law, and that the statute has not made them illegal, but only non-enforceable, *Thacker* v. *Hardy, ubi supra*, while generally, in this country, all wagering contracts are held to be illegal and void as against public policy. *Dickson's Executor* v. *Thomas*, 97 Penn. St. 278; *Gregory* v. *Wendell*, 40 Mich. 432; *Lyon* v. *Culbertson*, 83 Ill. 33; *Melchert* v. *American Union Telegraph Company*, 3 McCrary, 521; *S. C.* 11 Fed. Rep. 193, and note; *Barnard* v. *Backhaus*, 52 Wis. 593; *Kingsbury* v. *Kirwan*, 77 N. Y. 612; *Story* v. *Salomon*, 71 N. Y. 420; *Love* v. *Harvey*, 114 Mass. 80.

The charge of the court, however, is objected to on behalf of the plaintiff in error as misleading by the statement embodied in it, that "on their face these transactions are legal."

We presume that nothing more was meant by this than what had just before been said in the charge, that the burden of proof to show the illegality of the transactions was upon the defendant, who affirmed it; the presumption being that men ordinarily in their business transactions do not intend to violate the law. It is argued, however, that the expression is ambiguous and misleading, as calculated to convey to the jury an opinion that the transactions as disclosed by the evidence were not merely lawful in form, but also in fact, without other proof the contrary. We do not doubt, that the question whether

the transactions came within the definition of wagers, is one that may be determined upon the circumstances, the jury drawing all proper inferences as to the real intent and meaning of the parties; for, as was properly said in the charge, " It makes no difference that a bet or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade." It might therefore be the case, that a series of transactions, such as that described in the present record, might present a succession of contracts, perfectly valid in form, but which on the face of the whole, taken together, and in connection with all the attending circumstances, might disclose indubitable evidences that they were mere wagers. The jury would be justified in such a case, without other evidence than that of the nature and circumstances of the transactions, in reaching and declaring such a conclusion.

Objection was made at the trial by the plaintiff in error to proof of the customs of the grain commission merchants operating through the Corn and Flour Exchange, and exception was taken to its admission. They were also made the subject of a charge to the jury, to which exception was taken. That portion of the charge is as follows:

" 7. The testimony tends to·show that a general custom obtained among grain commission merchants in Baltimore to the following effect: When one commission merchant, upon the order of a customer, sells to another commission merchant a quantity of grain for future delivery, and where it occurs that at some other time before the maturity of the contract the same commission merchant receives an order from another customer to purchase the same or a larger quantity of the same kind of grain for the same future delivery, and he executes this second order by making the purchase from the same commission merchant to whom he had made the sale in the other case, that then, in such case, the two commission merchants meet together and exchange or cancel the contracts as between themselves, adjusting the difference in the prices between the two contracts, and restoring any margins that may have been put up, and that from that time forth the first commission merchant holds for the benefit of the

customer for whom he sold the order or contract of the purchaser for whom he bought, so that the wheat of the selling customer may, when delivered, be turned in on the order or contract of the purchasing customer, and that the commission merchant is held responsible as guarantor to his customer.

"The evidence further tends to show a custom obtaining among commission merchants at Baltimore to the further effect that, though the second transaction may have been had with a different commission merchant from the one with which the first transaction was had, yet where it can be found that a series of contracts are in existence for the sale of like grain, for like delivery, so that the seller owes the wheat to the buyer to whom he sold, and he to another, who owes like wheat for like delivery to the first commission merchant, that then, in such case, they settle by what they call a ' ring,' that is, they all reciprocally surrender or cancel their contracts, adjust the price differences between themselves, and surrender all margins that had been put up ; that in all such cases the commission merchant substitutes the contract of another customer in place of that with the commission merchant whose contract has been cancelled or surrendered, and that he guarantees to his customer the performance of the contract originally made on his behalf.

"I say to you, gentlemen, that these customs are founded in commercial convenience ; that they are not in contravention of the law, and that they are valid." -

The case which the plaintiffs below stated in their declaration was, that in pursuance of orders from the defendant's firm they had sold to responsible purchasers the wheat mentioned for future delivery, and on failure of Irwin & Davis to forward the grain for delivery when due, upon instructions from them, the plaintiffs had purchased the necessary quantity and delivered the same in performance of the contracts, the recovery sought being for the difference between what it cost them to purchase the grain delivered and the prices received on the contracts of sale.

The proof was, except as to 40,000 bushels actually delivered, that the settlements in pursuance of which these advances were made by the plaintiffs below on account of Irwin & Davis were

made according to the customs of the Grain and Flour Exchange, which were admitted in evidence.

The bill of exceptions states that "there was evidence tending to show that after the making of divers of the contracts for sale of wheat in the declaration mentioned, which were made to members of said Corn and Flour Exchange, the same were, before the expiration of the respective times therein named for the delivery of the wheat, settled and cancelled as between the plaintiffs and the said respective parties with whom they had in the first instance contracted said sales by mutual surrender of contracts pursuant to the customs aforesaid; and that the orders of customers in the fulfilment of which said cancelled contracts had been made were substituted by the plaintiffs in lieu of such cancelled or surrendered contracts, and held in the lieu and stead thereof for the use and benefit of said Irwin & Davis, in accordance with the usages and customs aforesaid, the plaintiffs standing as guarantors to said Irwin & Davis that the respective parties so ordering the wheat would accept and pay for it on delivery, and that said Irwin & Davis should receive the full price at which the respective sales on their behalf had originally been made."

The question is, there being no evidence that Irwin & Davis had any knowledge of the existence of these customs, whether they were bound by them.

The relation between the parties to this litigation was that of principal and agent; and the defendants in error, acting as brokers, in executing the orders to sell, undertook to obtain, and, as they allege in their declaration, did obtain a responsible purchaser; so that the plaintiff in error would, upon the contract of sale against such purchaser when disclosed, have been entitled to maintain an action in case of default in his own name. Although the broker guaranteed the sale, it was not a sale to himself; for, being agent to sell, he could not make himself the purchaser. The precise effect, therefore, of the custom proved was, that at the time of settlement, in anticipation of the maturity of the contracts, the brokers, by an arrangement among themselves, by a process of mutual cancellation, reduced the settlement to a payment of differences, exchanging con-

tracts, so as to substitute new purchasers and new sellers respectively for the balances. The question is not whether in a given case, without the assent, express or implied, of the principal, this change of his rights and obligations can be effected (for that proposition is not doubtful), but whether the fact of his transacting business through a member of the Exchange, without other knowledge of the custom, makes it part of his contract with the broker.

In *Nickalls* v. *Merry*, L. R. 7 H. L. 530, it was said by Lord Chelmsford, p. 543, that the contract "having been made between a broker and a jobber, members of the *Stock Exchange*, the usage of that body enters into, and to a certain extent determines and governs, the nature and effect of the contract." To what extent such a custom shall be allowed to operate, as between the broker and his principal, was very thoroughly considered and finally decided by the House of Lords in the case of *Robinson* v. *Mollet*, L. R. 7 H. L. 802, after much division of opinion among the judges. The custom questioned in that case was one established in the London tallow trade, according to which brokers, when they received an order from a principal for the purchase of tallow, made a contract or contracts in their own names, without disclosing their principals, either for the specific quantity of tallow so ordered, or to include such order with others in a contract for the entire quantity, or in any quantities at their convenience, at the same time exchanging bought and sold notes with the selling brokers, and passing to their principals a bought note for the specific quantity ordered by them. When a broker so purchased in his own name, he was personally bound by the contract. On the usual settling days the brokers balanced between themselves the purchases and sales made, and made or received deliveries to or from their principals, as the case might be, or if their principals refused to accept or deliver, then they sold or bought against them, and charged them with the loss, if any ; or if delivery was not required on either side, then any difference arising from a rise or fall in the market was paid by one to the other. It was held that this custom did not bind a principal giving an order to a broker to purchase for him, being ignorant of its ex-

istence. It was admitted by Lord Chelmsford, p. 836, "that if a person employs a broker to transact for him upon a market, with the usages of which the principal is unacquainted, he gives authority to the broker to make contracts upon the footing of such usages, provided they are such as regulate the mode of performing the contracts and do not change their intrinsic character;" and he added, "of course, if the appellant knew of the existence of the usage, and chose to employ the respondents without any restriction upon them, he might be taken to have authorized them to act for him in conformity to such usage." Mr. Justice Brett, in his opinion, p. 816, points out very clearly that the custom, if allowed to prevail, would work a change in the relation between the broker and his principal, by permitting the agent to buy, to convert himself into a principal to sell. Mr. Baron Cleasby, p. 828, said:

" The vice of the usage set up in the present case cannot be appreciated by examining its parts separately. It must be looked at as a whole, and its vice consists, I apprehend, in this, that the broker is to make the contract of purchase for another whose interest as buyer is to have the advantage of every turn of the market ; but if the broker may eventually have to provide the goods as principal, then it becomes his interest as seller that the price which he is to receive should have been as much in favor of the seller as the state of the market would admit. Thus the two positions are opposed."

The principle of this decision seems to us to be incontrovertible, and applies in the present case.

The ground of the action is, that the defendants in error, at the request of Irwin & Davis, had made certain contracts for the sale and future delivery of grain; that these contracts were made in the name of the brokers, on which therefore they were personally liable, but in which Irwin & Davis were the principals; that the latter were bound to perform them, or to place in the hands of their brokers means of performance within the proper period, or to indemnify them against the consequences of non-performance; that Irwin & Davis in all these particulars became in default, and the plaintiffs were required to perform

out of their own means, which they did by purchasing grain for delivery at the market price, or paying the difference between that and the contract price. The custom proved was offered to show this performance and consequent loss; and in doing so it disclosed that the brokers did not perform the original contracts of sale actually made, but delivered equal quantities of grain, or its market value, in fulfilment of contracts of purchase made by them for others, and which, by the process of mutual exchange authorized by this custom, had come into their hands for that purpose. This exchange and substitution, and payment of differences to effect it, working as it does a complete change in the nature of the seller's rights and obligations, cannot be made without his assent, and that assent can be implied only from knowledge of the custom which it is claimed authorizes it.

The Circuit Court therefore erred in permitting proof of this custom, without evidence that the defendant below had knowledge of it, and in not instructing the jury to disregard it, if they were satisfied from the evidence that such knowledge had not been satisfactorily shown.

The judgment of the Circuit Court is therefore reversed, with directions to grant a new trial, and

*It is so ordered.*