## MARSHALL v. LOVELL.

(District Court, D. Minnesota, Third Division. March 18, 1926.)

1. **Contracts** ⟷113(3)—**Contract between member of bondholders' committee and purchaser of public utilities property from committee for secret profit held void.**

Contract between dominating member of bondholders' committee, prosecuting proceedings to foreclose trust deed of public utilities property, and one to whom committee had agreed to sell the property, after bidding it in at receiver's sale, for a secret profit, consisting of part profits which purchaser would make on a resale, also prearranged, *held* illegal and void.

2. **Contracts** ⟷138(3).

Property delivered under an illegal contract cannot be recovered back by any party in pari delicto.

3. **Contracts** ⟷138(3) — **Dereliction of both intended purchaser of public utilities property and member of bondholders' committee in making agreement for secret profit held such that consideration paid thereunder could not be recovered.**

Where dominating member of bondholders' committee, foreclosing trust deed of public utilities property, made agreement for secret profit with one to whom committee had arranged to sell the property after bidding it in at receiver's sale, *held*, though agreement was forced by threat of member of bondholders' committee to block sale, the dereliction of both parties was such that money and securities voluntarily paid by purchaser pursuant to such agreement could not be recovered.

**4. Contracts ⊚⟲138(3) — Purchaser of public utilities property, paying secret profit to member of bondholders' committee, held not entitled to recover it on grounds of public policy.**

Where member of bondholders' committee, foreclosing trust deed of public utilities property, after exacting a secret profit from purchaser, to whom committee sold property after bidding it in at receiver's sale, when a return thereof was demanded, took position that such property belonged to bondholders, and after retaining his proportionate share delivered balance to trust company for them, *held*, that purchaser of property who had paid such profit could not, on ground of public policy, recover the payment, or even a portion of it retained by person with whom he had contracted.

In Equity. Suit by Warner Marshall against Walter D. Lovell. Bill dismissed.

Denegre, McDermott, Stearns & Weeks, of St. Paul, Minn., and Franklin F. Phillips, Jr., of Boston, Mass., for plaintiff.

Shearer, Byard & Trogner, of Minneapolis, Minn., for defendant.

JOHN B. SANBORN, District Judge. This cause came on to be heard before the court at a term thereof held in the city of St. Paul, Minnesota, on the 28th day of November, 1925. Denegre, McDermott, Stearns & Weeks, of St. Paul, Minn., and Franklin F. Phillips, Jr., of Boston, Mass., appeared as solicitors for the plaintiff, and Shearer, Byard & Trogner, of Minneapolis, Minn., for the defendant.

Walter D. Lovell, an engineer, contractor, and business man of St. Paul, Minn., in 1910 was heavily interested as a bondholder in the Wenatchee Valley Gas & Electric Company. The business of that company was the manufacture and sale of electricity in central Washington. The company got into financial difficulties soon after it was organized. There was a default in interest on its bonds in 1913. In 1914 the bondholders made a loan to take care of interest. In 1915 the same situation occurred. Prices of all materials were going up, and rates were not increasing proportionately. The bondholders voluntarily reduced the interest upon their bonds, and a bondholders' advisory committee, consisting of W. D. Lovell and W. S. Taylor, was formed. It acted in an advisory capacity to the president of the company from February 4, 1915, until December 10, 1919.

On December 10, 1919, the bondholders appointed a committee, consisting of W. D. Lovell, John B. Fassett, and W. S. Taylor, the duties of which were to protect the interests and enforce the rights of the bond-holders. The title to all of the bonds deposited was placed in the members of the committee in trust for the depositors. The agreement creating the committee contained the usual provisions of such agreements. Its effect was to place all of the bonds in the hands of the committee, with full power to them to do such things as were necessary to protect the interests of the bondholders. In case of reorganization of the company, the agreement required that it be submitted to the bondholders for their approval or rejection.

Mr. Lovell eventually became possessed of some 233 bonds, of the par value of $1,000 each. Mr. Walter Remley, his brother-in-law, owned 79 bonds, R. T. Lovell, a brother, 7, and there were other bonds which were occasionally represented by Mr. Lovell. Because of the bonds which he owned, those which he controlled, his knowledge, ability, and practical experience, he was the dominating personality of the bondholders' committee. The committee commenced an action for the foreclosure of the trust deed securing the bonds, and secured the appointment of Mr. Lovell's brother, Robert J. Lovell, as receiver. In order to operate the property, he was obliged to issue receiver's certificates, which, together with the expenses of administration of the receivership, constituted prior liens upon the company's property. Under all of the circumstances, it was the desire of the committee to dispose of this property as soon as a reasonable price could be obtained. Mr. Lovell was active in endeavoring to find a purchaser.

The Washington Coast Utilities Company was the owner of a hydroelectric property situated near the west coast of Washington. Its president and general manager from 1919 to 1923 was Frederick B. Nims, an engineer and a man of ability. Warner Marshall, a resident of New York and an investment banker, had been instrumental in its organization and promotion, and was its first president. Its common stock was owned by Marshall & Co., of Boston, which was controlled by Mr. Marshall up until about March, 1921. Marshall, or Marshall & Co., had sold the securities for the Washington Coast and had acted as its fiscal agent.

In 1917 it had first been suggested that this company might be interested in buying the properties of the Wenatchee Valley Gas & Electric Company, and between that time and the spring of 1921 negotiations had been had looking toward a consolidation of the properties, or a sale of the properties of the latter company. Mr. Nims and Mr. Mar-

shall in the fall of 1920 had had a consultation with Mr. Lovell with reference to a purchase of the properties, but nothing had come of it. In the spring of 1921 Mr. Lovell sent word to Mr. Nims that he was on his way East; that he had negotiations on with Stone & Webster, and others, who might be interested in the purchase of the properties of his company, and requesting Mr. Nims to assist him in these negotiations. An arrangement was made whereby Mr. Nims was to assist Mr. Lovell. If the properties were sold to any one except the Washington Coast Utilities Company, the expenses of Mr. Nims were to be paid by the bondholders' committee. He met Mr. Lovell in Boston, and told him that, while he was dealing with Stone & Webster and others, he would not make any proposition to him on behalf of his own company, but that, if he failed to make a sale to them, he would endeavor to bring about a purchase by his company.

Mr. Lovell was unable to make a satisfactory arrangement with others, and early in April Mr. Nims, Mr. Marshall, and Mr. Lovell negotiated a tentative agreement for the sale of the Wenatchee properties to Mr. Marshall. The Washington Coast Utilities Company could issue bonds and preferred stock, but had no cash to invest. The receiver's certificates and prior liens upon the Wenatchee properties amounted to about $200,000, and, in order that the properties might be delivered to the Washington Coast Utilities free and clear of encumbrances, it was arranged that Mr. Marshall should buy the properties from the receiver of the Wenatchee Company and should transfer them to the Washington Coast. That company agreed with Mr. Marshall that, if he could arrange for a purchase and transfer of these properties, it would transfer to him, as the purchase price thereof and his compensation, $225,000 of its common stock, $350,000 of its preferred stock, and $760,000 of bonds. The tentative agreement which was reached by Mr. Nims, Mr. Lovell, and Mr. Marshall was that the bondholders of the Wenatchee Company should receive for each $1,000 bond which they held $500 of preferred stock and a $500 bond of the Washington Coast, and that, in addition, Mr. Marshall should pay off the receiver's certificates and all prior liens in cash. It would require $327,000 of this preferred stock and an equal amount of bonds to carry out the agreement with the bondholders of the Wenatchee Company. It would require about $250,000 of bonds to raise the money

to pay off prior liens. That would leave Mr. Marshall as his compensation $225,000 of common stock, $23,000 of preferred stock, and about $183,000 of bonds, a total of about $431,000 par value of securities. These securities were at that time not worth par, but had a very substantial value.

The tentative arrangement was that the bondholders' committee should bid in the properties of the Wenatchee Company at the foreclosure sale, and should then transfer them to Mr. Marshall. After the tentative arrangement had been made, a meeting of the bondholders' committee was called at the Pennsylvania Hotel in New York City, on or about the 9th day of April, and it was then agreed, after a memorandum had been drawn up and signed by Mr. Marshall, Mr. Nims, and two of the committeemen, Messrs. Taylor and Fassett, that the arrangement was approved by the committee, and that it should be submitted to a meeting of the bondholders of the company for ratification. Mr. Nims, Mr. Fassett, and Mr. Taylor then left the place of meeting, leaving Mr. Marshall and Mr. Lovell together. Mr. Marshall states that, after Nims and the others had gone, Mr. Lovell told him, in substance, that the deal would never go through unless he received substantially $200,000 of securities; that he would vote against its ratification otherwise. Mr. Marshall says that this came as a complete surprise to him; that he realized that Mr. Lovell was in a position to defeat the ratification of this agreement by the bondholders; that he (Marshall) was faced with the alternative of losing his entire profit or losing a considerable portion of it, and that he decided upon the least of the two evils from his point of view, and acceded to Lovell's demand that he have a very substantial personal compensation. He says that, after Nims returned, he advised him of the situation, and in effect told him to make the best arrangement with Lovell that he could, and that he then left for Boston, where he was residing at that time. Mr. Lovell's claim is that he and Mr. Nims had discussed the matter of personal compensation before, and that it was understood by both Mr. Nims and Mr. Marshall that he was to have such compensation.

Mr. Lovell and Mr. Nims worked out the terms of the agreement to be signed by Warner Marshall and the bondholders' committee. This agreement was dated the 14th day of April, 1921, and provided for the bidding in of the property at the receiver's sale and for the payment of the bondholders in ac-

cordance with the arrangement previously referred to. This agreement was subject to approval by the bondholders.

At the same time an agreement between Mr. Lovell and Mr. Marshall was drawn up, without the knowledge of any of the other members of the bondholders' committee, pursuant to which Lovell agreed to use his best efforts to bring about the adoption of the agreement, to defray the expenses of the bondholders' committee, to give advice on engineering matters, to give advice concerning business and financial affairs, to represent Marshall in negotiating with banks and others, if it became necessary, to pay any allowance made by the court for compensation to the receiver in excess of $7,500 a year, and to deliver to Marshall, after the sale was closed, $43,000 of the 6 per cent. cumulative preferred stock of the Washington Coast Utilities. Marshall, on his part, agreed to deliver to Lovell, after the deal was closed, $127,000 of the 6 per cent. first mortgage bonds of the Washington Coast Utilities, and $50,000 of its 6 per cent. notes, to be paid as follows: One note of $5,000, one year from date; one note of $5,000, two years from date; one note of $5,000, three years from date; one note of $5,000, four years from date; six notes of $5,000, five years from date—the notes to be dated the day the title to the Wenatchee properties passed to Warner Marshall, and to pay Lovell $5,000 in cash on that day; to purchase from Lovell $100,000 face value of the Washington Coast Utilities first mortgage 6 per cent. bonds within a year from the date of acquisition of title, at a price of not less than $750 per bond; to co-operate with the receiver for the issuance of new receiver's certificates, to be sold at whatever discount might be necessary to provide funds for the payment of $36,000 of receiver's certificates then held by Lovell.

The contract between Lovell and Marshall was dated May 1st, although made contemporaneously with the committee contract, and performance of both contracts by Marshall was guaranteed by the Washington Coast Utilities Company. It was arranged that letters were to pass between Marshall and Lovell which should make it appear that this contract was an afterthought, and was made at the solicitation of Marshall and for the procurement of Lovell's services, advice, etc. The agreement reached between Mr. Marshall and the bondholders' committee was ratified by the bondholders on August 4, 1921. At that meeting Mr. Lovell voted a majority of the bonds. If he had voted against the proposed agreement, it could not have been ratified. Thereafter, with considerable difficulty, Mr. Marshall raised the necessary cash to take over the property, which was bid in by the bondholders' committee under his direction, and the properties were transferred to him, and by him to the Washington Coast Utilities Company. Upon the completion of the sale in December, 1921, Marshall carried out his private agreement with Lovell and delivered to him the securities and cash which he had agreed to deliver.

In February, 1923, Mr. Marshall demanded the return of what Mr. Lovell had received from him under the contract, or its value, agreeing to offset the preferred stock which he had received from Mr. Lovell. This was refused. At that time Mr. Lovell took the position that the securities which he had received from Marshall, under his private agreement, belonged to the bondholders of the Wenatchee Company, and he delivered to a trust company, for them, the amount of bonds representing their proportionate share, retaining the amount which represented his proportion as a bondholder.

These, in a general way, are the facts leading up to the commencement of this action, in which Mr. Marshall asks the court to determine that the contract between himself and Mr. Lovell was void, and that he is entitled to a return of what Lovell received from him, or its value, less the value of the securities Lovell assigned to him.

There is a flat contradiction in the evidence as to when the agreement between Marshall and Lovell was reached, and the testimony of Mr. Nims, which was taken by deposition, is not as helpful on that point as could be wished. There are indications that Mr. Marshall had a very rapid recovery from the effects of the shock of Mr. Lovell's demand upon him. Mr. Nims, in his testimony, does not say that he knew of any arrangement whereby Lovell was to have a secret profit, but he does say that he received the information, pursuant to which he drew up the contract, from Mr. Marshall, both before and after he left for Boston; but the time when he received his information is not limited to the period between his return to the Pennsylvania Hotel, after leaving Mr. Fassett and Mr. Taylor, and the time when Marshall left for Boston. In his testimony Mr. Nims also says that he did not offer Mr. Lovell private gain for favorable action, and did not hear Marshall do so. What little there is of Nims' testimony on the subject seems to bear out Marshall's claim, and Lovell's testi-

mony that the arrangements were made before the committee meeting is not convincing.

It seems probable that Mr. Lovell knew that Mr. Marshall was making a very handsome profit out of his arrangement with the Washington Coast Utilities Company, without rendering any extraordinary or prolonged service. Mr. Lovell himself had put in a great deal of time, without compensation, in connection with services rendered to the bondholders of the Wenatchee Company; he was a man of an acquisitive disposition, to say the least, and evidently saw an opportunity, at a time when it was reasonably certain that the contract for the sale of the property would go through, to acquire some of the profits which Mr. Marshall would otherwise receive. I find that Mr. Lovell did make the exaction from Mr. Marshall at the time and under the circumstances which he (Marshall) claims.

The plaintiff's theory is that the defendant Lovell is in possession of a gain unlawfully acquired under a contract void ab initio, that the illegality of the contract is malum prohibitum, and that he is entitled to recover the benefits bestowed by him upon the defendant in performance of the contract, upon grounds of public policy and further upon the ground that he was coerced into making the contract.

[1] There can be no question as to the invalidity of the contract. It is obvious that what Marshall was buying and what Lovell was selling was the ability of Lovell to assure a sale of the Wenatchee Valley properties to Marshall. Lovell, at the time he made the contract, was a trustee, and was not permitted to place himself in a position where his self-interest would or might conflict with his duties as such.

"In administering the trust, the trustee must act for the beneficiaries, and not for himself in antagonism to the interests of the beneficiaries; he is prohibited from using the advantages of his position to gain any benefit for himself at the expense of the cestuis que trustent, and from placing himself in any position where his self-interest will, or may, conflict with his duties as trustee." 39 Cyc. 296.

"Contracts, the object or tendency of which is to constitute a fraud or breach of trust or breach of duty on the part of one who stands in a fiduciary or confidential relation, are illegal and void, as constituting, or tending to constitute, a fraud on third persons. While it is often said that such agreements are against public policy, because it is the policy of the law to secure fidelity in the discharge of their duties by all persons holding such positions of trust and confidence, yet it is more accurate to say that such agreements, tending to cause unfaithful conduct by fiduciaries, are illegal because they are in effect agreements to wrong or to defraud the persons whose interests the fiduciaries have in charge. * * * To bring an agreement within this rule it must appear both that there was in fact some relation of trust or confidence and that the agreement contemplated or tended to a violation of the same. The fact, however, that the third person with respect to whom the relation of trust or confidence exists is not injured will not purge the contract of its illegality." 13 C. J. 415, 417.

See Lum v. McEwen, 57 N. W. 662, 56 Minn. 278; Torpey v. Murray, 101 N. W. 609, 93 Minn. 482; City of Minneapolis v. Canterbury, 142 N. W. 812, 122 Minn. 301, 48 L. R. A. (N. S.) 842, Ann. Cas. 1914D, 804; Kampfer v. Peterman (Minn.) 207 N. W. 633, decision filed March 5, 1926; Wardell v. Railroad Co., 103 U. S. 651, 26 L. Ed. 509; U. S. v. Carter, 30 S. Ct. 515, 217 U. S. 286, 54 L. Ed. 769, 19 Ann. Cas. 594; City of Findlay v. Pertz, 66 F. 427, 13 C. C. A. 559, 29 L. R. A. 188.

[2] The agreement between Marshall and Lovell was illegal and void. The question then arises as to whether Marshall has any standing in this court, being a party to an illegal contract. It is the settled rule that property delivered under an illegal contract cannot be recovered back by any party in pari delicto. Harriman v. Northern Securities Co., 25 S. Ct. 493, 504, 197 U. S. 244, 295, 296 (49 L. Ed. 739). In that case appears the following quotation:

" 'The general rule, in equity, as at law,' said Mr. Justice Gray in St. Louis, Vandalia & Terre Haute Railroad Company v. Terre Haute & Indianapolis Railroad Company [12 S. Ct. 953] 145 U. S. 393 [36 L. Ed. 748] 'is in pari delicto potior est conditio defendantis; and therefore neither party to an illegal contract will be aided by the court, whether to enforce it or to set it aside. If the contract is illegal, affirmative relief against it will not be granted, at law or in equity, unless the contract remains executory, or unless the parties are considered not in equal fault, as where the law violated is intended for the coercion of the one party, and the protection of the other, or where there has been fraud or oppression on the part of the defendant. Thomas v. Richmond, 12 Wall. 349, 355 [20 L. Ed. 453]; Spring Co. v. Knowlton, 103 U. S. 49 [26 L. Ed.

347]; Story Eq. Jur. § 298. * * * When the parties are in pari delicto, and the contract has been fully executed on the part of the plaintiff, by the conveyance of property, or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract. Thomas v. Richmond, supra; Ayerst v. Jenkins, L. R. 16 Eq. 275, 284.' "

The court also says with reference to this point:

"In the present case complainants seek the return of property delivered to the Securities Company pursuant to an executed contract of sale on the ground of the illegality of that contract, but the record discloses no special considerations of equity, justice or public policy, which would justify the courts in relaxing the rigor of the rule which bars a recovery. * * * We regard the contention that complainants are exempt from the doctrine in pari delicto because the parties acted in good faith and without intention to violate the law as without merit. With knowledge of the facts and of the statute, the parties turned out to be mistaken in supposing that the statute would not be held applicable to the facts. Neither can plead ignorance of the law as against the other, and defendant secured no unfair advantage in retaining the consideration voluntarily delivered for the price agreed."

In the case of Thomas v. City of Richmond, 12 Wall. (79 U. S.) 349, 20 L. Ed. 453, the court said:

"Lord Mansfield, in Smith v. Bromley, as long ago as 1760, laid down the doctrine, which has ever since been followed, in these words: 'If the act be in itself immoral, or a violation of the general laws of public policy, both parties are in pari delicto, but where the law violated is calculated for the protection of the subject against oppression, extortion, and deceit, and the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover.' In that case the plaintiff had given the defendant money to sign her brother's bankrupt certificate, and she was allowed to recover it back, the law prohibiting any creditor from receiving money for such a purpose. Whilst the general principle has been frequently recognized, the application of it to particular cases has been somewhat diverse. Mr. Frere, in his note to Smith v. Bromley, thus sums up the result of the cases: A recovery can be had, as for money had and received: (1)

Where the illegality consists in the contract itself, and that contract is not executed; in such case there is a locus pœnitentiæ, the delictum is incomplete, and the contract may be rescinded by either party. (2) Where the law that creates the illegality in the transaction was designed for the coercion of one party and the protection of the other, or where the one party is the principal offender and the other only criminal from a constrained acquiescence in such illegal conduct; in such cases there is no parity of delictum at all between the parties, and the party so protected by the law, or so acting under compulsion, may, at any time, resort to the law for his remedy, though the illegal transaction be completed."

In the case of St. Louis Rd. v. Terre Haute Rd., supra, 12 S. Ct. 953, 145 U. S. 393, 36 L. Ed. 748, Mr. Justice Gray, after stating the rule that, where a contract has been fully executed and the parties are in pari delicto, the plaintiff cannot recover, says:

"For instance, property conveyed pursuant to a contract made in consideration of the compounding of a crime, and the stifling of a criminal prosecution, and therefore clearly illegal, cannot be recovered back at law, nor the conveyance set aside in equity, unless obtained by such fraud or oppression on the part of the grantee, that the conveyance cannot be considered the voluntary act of the grantor. Worcester v. Eaton, 11 Mass. 368, and 13 Mass. 371 [7 Am. Dec. 155]; Atwood v. Fisk, 101 Mass. 363 [100 Am. Dec. 124]; Bryant v. Peck & Whipple Co. [28 N. E. 678] 154 Mass. 460; Williams v. Bayley, L. R. 1 H. L. 200; Jones v. Merionethshire Society, 1892, 1 Ch. 173, 182, 185, 187."

See, also, Pennsylvania Railroad v. St. Louis, Alton & Terre Haute Railroad, 6 S. Ct. 1094, 118 U. S. 290, 30 L. Ed. 83; Union Trust Co. v. Illinois Midland Co., 6 S. Ct. 809, 117 U. S. 434, 29 L. Ed. 963; Central Transportation Co. v. Pullman's Car Co., 11 S. Ct. 478, 139 U. S. 24, 35 L. Ed. 55.

In the case of Stewart v. Wright, 147 F. 321, 77 C. C. A. 499, decided by the Circuit Court of Appeals of the Eighth Circuit, is found an elaborate discussion, both in the affirming and the dissenting opinion, of this question. Judge Hook, who wrote the opinion of the court, says on page 329 (77 C. C. A. 507):

"The rule which declares that when parties are in equal wrong the position of the defendant is the better, and that the courts will not allow their machinery to be used for

the relief of one who has been defrauded in a corrupt or illegal transaction in which he participated, is based not upon statutory provisions, but upon general principles of public policy. It is therefore not for the sake of the defendant that the rule is enforced, but to promote the general good. And when the objection is urged by the defendant, or is suggested by the court of its own motion, two questions present themselves for consideration: Were the parties in equal wrong,. or was there such fraud, deceit, oppression, or inequality as challenges the attention of a court of justice? If they appear to be in equal wrong, will nevertheless a wise regard for the general welfare be better subserved by the punishment of the defendant than by denial of relief to the complaining party? In 1 Story, Eq. Jur. § 300, it is said: 'And indeed in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto, for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, hardship, undue influence, or great inequality of condition or age, so that his guilt may be far less in degree than that of his associate in the offense. And, besides, there may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be.' "

Judge Walter H. Sanborn, in his dissenting opinion, on page 338 (77 C. C. A. 516), says:

" 'Ex dolo malo non oritur actio.' It is the settled public policy of the United States that its courts shall sustain no action, whether in tort or on contract, which arises out of the moral turpitude of the plaintiff, or from his violation of a general law of public policy, because the maintenance of such actions promotes violations of the moral law and of the civil law by inspiring the belief that one may safely violate both, since if he loses the courts will make him whole. This rule is not conditioned nor limited by the maxim, 'In pari delicto potior est conditio defendantis,' nor by any requirement that the guilt of the plaintiff must be equal to that of the defendant. Such a limitation would destroy the rule, because the cases are rare, perhaps none ever arises, in which the intelligence, knowledge, and situations of the parties are such that their guilt is equal [citing cases]. * * * The maintenance of actions to recover moneys or property lost or damages sustained through transactions or contracts wherein the plaintiffs are guilty of moral

turpitude or of the violation of a general law of public policy is as imperatively prohibited by the foregoing rule as the maintenance of actions to enforce contracts of that nature [citing cases]. * * * The test which determines whether or not a plaintiff is in pari delicto, within the true meaning of this maxim, is not whether his guilt is equal to that of the defendant, but whether or not the whole transaction upon which his case is founded can be portrayed to the court without disclosing his moral turpitude or his violation of a general law of public policy. Taylor v. Chester, L. R. 4 Q. B. 314, 315; Simpson v. Bloss, 7 Taunt. 256; Gregg v. Wyman, 58 Mass. 322, 326, and authorities there cited."

On page 346 (77 C. C. A. 524) Judge Sanborn says:

"If the decisions of the Supreme Court have not been misapprehended, they evidence a uniform and established public policy of the nation to refuse to maintain in its courts any action which is founded in a plaintiff's immoral contract or act, or in his contract or act violative of a general law of public policy. This rule of public policy is not conditioned or limited by any inquiry into the equality of the guilt of the plaintiff and the defendant. It applies wherever the plaintiff is particeps criminis, whatever the degree of his guilt. It forbids the maintenance of actions to repudiate or rescind corrupt contracts and transactions, and to recover the money lost in their performance as imperatively as actions to enforce them."

The facts in the case of Stewart v. Wright are very different from the facts in this case, but the rule of law is applicable. Judge Hook says that there are two questions to be answered by the court: (1) Were the parties in equal wrong, or was there such fraud, deceit, oppression or inequality as challenges the attention of a court of justice? (2) If they appear to be in equal wrong, will nevertheless a wise regard for the general welfare be better subserved by the punishment of the defendant than by denial of relief to the complaining party?

[3] In answering the first question, let us consider the facts:

Mr. Marshall says that he did not bribe Lovell; that he was the victim of an unjust exaction; that Lovell was threatening to violate his duty to the bondholders by defeating the ratification of the contract of sale; in other words, that he was threatening to be disloyal to his trust, and that the effect of the private contract which Marshall made with him was to secure his loyalty to his trust.

This contention is somewhat similar to one made by an attorney accused of bribing a witness, who said that he did not bribe him to testify falsely, but to tell the truth. The fact is, of course, that Marshall made the contract with Lovell, so that he might be able to purchase the properties from the bondholders and resell them, at a very considerable profit to himself, to the Washington Coast Utilities Company. In order to avoid the rule of law which has been referred to, Mr. Marshall has attempted to put himself in the position of one who has been coerced or duressed. Physically and mentally he admits himself to be in every way the equal of Mr. Lovell, but he says that Mr. Lovell had him in a position where he must either lose all of the profits which he was to make out of a very profitable enterprise, or must accede to Mr. Lovell's request that he enter into an illegal contract. The coercion, if there was coercion, affected only Mr. Marshall's pocketbook, and, while unfair on the part of Mr. Lovell, it could hardly be said to be such unfair dealing as to lead to the conclusion that the making of the contract was not the free and voluntary act of Mr. Marshall.

But, even if it could be said that the contract was originally procured by duress or coercion or unfair dealing, and that there was at that time such a disparity of dereliction as would challenge the attention of a court, the contract was not executed until more than six months afterwards, and it is not contended by Mr. Marshall that there was any duress or coercion at that time. The turning over to Mr. Lovell of the cash and securities called for by the contract was the voluntary act of Marshall. It is true that Mr. Lovell was a trustee and that Mr. Marshall was not. For that reason, the dereliction of Lovell was greater than that of Marshall; but, as pointed out by Judge Sanborn in the case of Stewart v. Wright, there are probably no cases where there is an exact parity of dereliction. There was a disparity of dereliction in the case of Irwin v. Williar, 4 S. Ct. 160, 110 U. S. 499, 28 L. Ed. 225; also in Harriman v. Northern Securities Co., supra.

[4] In answer to the second question, it may be said that a wise regard for the general welfare will not permit a trustee to retain funds which he has received because of his dealings with trust property or because of his position as trustee. But the law has taken care of that situation, not by requiring the faithless trustee to return what he received to the person who assisted him in being faithless, but by requiring him to account to those for whom he was acting as trustee.

In the case of City of Minneapolis v. Canterbury, 142 N. W. 812, 122 Minn. 301, 48 L. R. A. (N. S.) 842, Ann. Cas. 1914D, 804, the court said:

"The doctrine of constructive trust arising from abuse of fiduciary relations is too familiar to require exposition. Some consideration of its underlying principles is necessary, however, in order to determine whether it is applicable. No man can serve two masters, and 'the same person cannot act for himself, and at the same time with respect to the same matter, as the agent of another, whose interest might be in conflict with his;' nor can he be allowed to profit by his own wrong, even if such be only constructive wrong. Stone v. Bevans, 92 N. W. 520, 88 Minn. 127, 129, 97 Am. St. Rep. 506; Young v. City of Mankato, 105 N. W. 969, 97 Minn. 4, 3 L. R. A. (N. S.) 849. See also Riley v. Pearson, 139 N. W. 361, 365, 120 Minn. 210, [L. R. A. 1916D, 7]. The reason of the first two propositions lies in a recognition of a natural incapacity incident to the frailty of human nature; wherefore, as approvingly quoted by the Chancellor in Toronto v. Bowes, 4 Grant Ch. 489, 506, 'the wise policy of the law has therefore put the sting of a disability into the temptation as a defensive weapon against the strength of the danger which lies in the situation.' See, also, Bay v. Davidson, 111 N. W. 25, 133 Iowa, 688, 691, 9 L. R. A. (N. S.) 1014, 119 Am. St. Rep. 650; 2 Dillon, Mun. Corp. (5th Ed.) § 772. 'So strictly is this principle adhered to,' said Mr. Justice Vanderburgh, in Currie v. School District No. 26, 27 N. W. 922, 35 Minn. 163, 164, quoting from Aberdeen v. Blakie, 1 MacQueen, 461, 471, a case largely relied on in Toronto v. Bowes, supra, 'that no question is allowed to be raised as to the fairness, or unfairness, of a contract so entered into. * * * So inflexible is the rule that no inquiry on that subject is permitted.' See Bjelland v. City of Mankato [127 N. W. 397] 112 Minn. 24, 26, 140 Am. St. Rep. 460. And that the principal may have profited by the transaction is likewise immaterial so far as concerns its legality and validity. Lum v. McEwen, 56 Minn. 278, 282, 57 N. W. 662; Toronto v. Bowes, supra, 511–513; Bowes v. Toronto, 6 Grant Ch. 112, 113; Bay v. Davidson, supra, 693 [111 N. W. 25]."

Mr. Justice Lurton, in the case of United States v. Carter, 30 S. Ct. 515, 217 U. S. 286, 54 L. Ed. 769, 19 Ann. Cas. 594, says:

"It is not enough for one occupying a

confidential relation to another, who is shown to have secretly received a benefit from the opposite party, to say, 'You cannot show any fraud, or you cannot show that you have sustained any loss by my conduct.' Such an agent has the power to conceal his fraud and hide the injury done his principal. It would be a dangerous precedent to lay down as law that unless some affirmative fraud or loss can be shown, the agent may hold on to any secret benefit he may be able to make out of his agency. The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity or benefit in violation of his duty, or acquires any interest adverse to his principal without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received. The doctrine is well established and has been applied in many relations of agency or trust. The disability results not from the subject-matter but from the fiduciary character of the one against whom it is applied. It is founded on reason and the nature of the relation and is of paramount importance. 'It is of no moment,' said Lord Thurlow, in The New York Buildings Company v. Alexander Mackenzie, 3 Paton, 378, 'what the particular name or description, whether of character or office, situation or position is, on which the disability attaches.' Thus, in Aberdeen Railroad Company v. Blaikie Brothers, 1 MacQueen's Appeal Cases, 461, 472, it was applied to a contract of a director dealing in behalf of his company. Lord Chancellor Cranworth, in respect to the general rule, said:

"'And it is a rule of universal application, that no one having such duties to discharge, shall be allowed to enter into engagements in which he has, or can have, a personal interest conflicting, or which possibly may conflict with the interest of those he is bound to protect. So strictly is this principle adhered to, that no question is allowed to be raised as to the fairness or unfairness of a contract so entered into. It obviously is, or may be, impossible to demonstrate how far in any particular case the terms of such a contract have been the best for the interest of the cestui que trust, which it was possible to obtain. It may sometimes happen that the terms on which a trustee has dealt or attempted to deal with the estate or interests of those for whom he is a trustee, have been as good as could have been obtained from any other

person—they may even at the time have been better. But still so inflexible is the rule that no inquiry on that subject is permitted. The English authorities on this head are numerous and uniform.' "

See, also, Lane & Co. v. Maple Cotton Mill, 232 F. 431, 146 C. C. A. 415; Dutton v. Barnes, 162 Minn. 430, 203 N. W. 414.

It would be an unwise public policy which would take away from the bondholders represented by Mr. Lovell, who were the only innocent parties in this transaction, the bonds which they have received from him and turn them over to Mr. Marshall. It is true that Mr. Lovell, by virtue of his being a bondholder, will secure a large proportion of the benefits from this illegal contract; but at the time Mr. Marshall made the contract he knew that Lovell was a trustee, knew that he was acting for himself, as well as for others, was charged with knowledge that he could not make such a contract as he proposed to make, and that the law would require him to account to those for whom he was acting for profits he received while acting in the fiduciary capacity. If public policy required that Lovell part with anything, it would only be the proportion of the bonds which he personally became entitled to by virtue of this contract and which he retained. The second question, therefore, must be answered in the negative.

It may be also that the maxims, "He who comes into a court of equity must come with clean hands," and "He who has done iniquity cannot have equity," might preclude Mr. Marshall from the maintenance of this action. But, under the rules heretofore stated, where there is such a disparity of dereliction on the part of one of the parties to an illegal contract that equity will permit him to recover, these maxims are not invoked against him; so that the questions as to whether there is such disparity in this case, and whether public policy requires Lovell to give back to Marshall what he received, are the main questions of law involved.

The rights of the bondholders to retain these bonds are superior to any right Mr. Marshall might have to recover them. The question as to whether his making of this contract was an advantage to them, or otherwise, is of no importance. The fiduciary relations between Lovell and the bondholders were in existence at the time the contract was made, and continued in existence until the property was finally sold. During that time Mr. Lovell was disabled from dealing with the trust property, or taking advantage of his position as trustee to make any private

gain for himself, and whatever he received by virtue of that relation, in legal effect, was the property of those for whom he was acting. If Lovell had said to Marshall, after the committee contract had been made, "You have now made a contract for the purchase of this property, but this contract is not going to be ratified unless you pay to the bondholders an additional $200,000 in securities," and if Mr. Marshall had acquiesced in that proposal, no one would suggest for a moment that Mr. Marshall could recover the securities. It is true that both parties claim that the sale which was made was the best one which could have been obtained for the bondholders, but the facts will not sustain their contention in that regard. Marshall's own acts indicate that he was willing to part with what he did actually part with under the private contract, in addition to what he had agreed to pay for the property. It is therefore perfectly obvious that Mr. Lovell could have obtained for the bondholders exactly what he obtained for himself; so that, even if the plaintiff's theory is correct, that it must be shown that the bondholders lost something before they can be said to be entitled to the benefits of the private contract, they would still be entitled to retain what Marshall paid to their trustee.

The net result of the entire transaction was that Mr. Lovell made a much better bargain for the bondholders than either he or Mr. Marshall suspected or intended. The bill of complaint must be dismissed, with costs to the defendant and against the complainant.

It is so ordered.